## THE STATE OF KANSAS v. ISAAC G. REED.

1. DISCHARGE OF JURY—*Effect as Acquittal.* The discharge of a jury before the completion of a trial, without the consent of the accused, and without sufficient reason, will ordinarily bar a further trial; but where, after the trial was begun, a juror was reported sick, and where the sickness and incapacity of the juror to proceed with the trial were heard and determined by the court by judicial methods, and a finding made, based upon testimony which is not preserved, that a discharge was absolutely necessary, the appellate court cannot say that there was not good cause for the discharge, nor that the discharge should operate as an acquittal.

2. INFORMATION—*Indorsement of Names of Witnesses—Discretion of Court.* A motion to indorse the names of several witnesses upon the information was filed two months before the day of trial, and subsequently the names were irregularly indorsed upon the information. Afterward the indorsement was stricken off, when the motion was renewed, and an order made upon the day of trial permitting the county attorney to indorse the names of the same witnesses upon the information. It appears that the attention of the defendant and his attorneys was called to the witnesses, and further, that inquiry had been made of some of them as to what their testimony would be. *Held,* Under the circumstances, it cannot be said that the court abused its discretion in allowing the indorsement.

3. COMPETENCY OF JURORS—*Payment of Taxes.* The mere showing that persons called as jurors did not pay taxes on personal property on the preceding year does not prove that they were disqualified as jurors, especially where it does not appear but that they may have been upon the assessment rolls made in the listing of real and personal property.

4. HOMICIDE—*Dying Declarations.* Declarations made in the belief of impending death are admissible in evidence upon the trial of a charge of homicide, and the fact that death did not immediately ensue after the declaration was made, or that a hope of recovery was subsequently entertained, will not affect its admissibility.

5. EVIDENCE—*Criminal Intimacy—Motive for Killing.* In such a trial, where the theory of the prosecution is that the homicide was committed by the defendant because of the passion which he entertained for the wife of the deceased, and of the criminal intimacy which existed between them, of which the deceased had knowledge, testimony of the criminal intimacy is admissible in evidence in order to show motive in defendant for killing the deceased, and also to show the degree or grade of the crime that has been committed.

6. EVIDENCE—*Another Offense than that Charged.* As a general· rule, testimony tending to show the commission of another offense than the one charged is not admissible; but where such other offense is intimately connected with the one charged, important proof tending ·to establish the latter cannot be excluded because it may tend to prove the defendant guilty of the other offense.

7. CONDUCT OF DECEASED—*Inadmissible Evidence.* The admission of testimony of the manner and conduct of the deceased some time previous to the killing, which was not known to the defendant nor connected with the homicide, and which is of such character as to prejudice the defendant, is error.

8. PAPER, *Not Produced—Contents in Evidence—Error.* Statements were given of a paper and of its contents which related to the difficulty between the deceased and his wife, and which were of a prejudicial character as against the defendant. The paper itself was not produced, nor were the statements with reference to the same made in the presence of the defendant. *Held,* That the admission of the testimony was prejudicial error.

9. ADULTERY—*Cross-Examination, When Limited.* An extended cross-examination of the defendant with reference to his conduct 15 years before the occurrence of the homicide, and· which tended to prove · previous acts of adultery that had no connection with the offense charged, was not permissible.

10. DYING DECLARATIONS—*Admissibility for Court, Credibility for Jury.* The court must decide as a preliminary question whether a dying declaration was made under a sense of impending death, and the admissibility of the same is exclusively for the consideration of the court; but, after the evidence is admitted, its credibility is entirely within the province of the jury, who are at liberty to weigh all the circumstances under which the declarations were made, *including those already proved to the judge,* and to give such testimony only such credit as, upon the whole, they might think it deserves.

11. SELF-DEFENSE—*Justifiable Action.* A party who is unlawfully attacked by another may stand his ground and use such force as at the time reasonably appears to him to be necessary. He is justified in acting upon the facts as they appear to him, and is not to be judged by the facts as they actually are. ·

## Appeal from Cowley District Court.

ISAAC G. REED was convicted of murder in the second degree. He appeals. The material facts are stated in the opinion herein, filed July 6, 1894.

*Isaac G. Reed,* and *Chas. J. Peckham,* for appellant; *Elliott & Woods,* of counsel.

*John T. Little,* attorney general, and *C. J. Garver,* county attorney, for The State; *W. H. Schwinn,* of counsel.

The opinion of the court was delivered by

JOHNSTON, J.: Isaac G. Reed was charged, in an information filed in the district court of Sumner county, with shooting and killing Isaac Hopper, in Sumner county, in such a manner and with such an intent as to constitute murder in the first degree. The information was filed on August 31, 1892, and on October 10, 1892, upon application of the defendant, a change of venue was granted, and the cause transferred to the district court of Cowley county for trial. The trial was begun in the latter court on January 10, 1893, and after the impaneling of the jury, the production of the evidence for the state and for the defendant, the charging of the jury, after the opening argument in behalf of the state and the argument in favor of the defendant, and before the closing argument for the state had been completed, on January 20, one of the jurors became sick, and was unable to attend at the trial. The cause was continued from time to time for five days, and on January 26, after an examination, and without the consent of the defendant, the court determined that it was impossible for that jury to conclude the trial, and thereupon it discharged the jury. At the next term of the court, the plea of former jeopardy was interposed, and attached to it was the evidence taken by the court when the first jury was discharged; but the court sustained a demurrer, and ruled that the discharge of the jury, having been made necessary by the sickness of a juror, did not operate as a bar to a further trial. The trial then proceeded, and the defendant was convicted of murder in the second degree, from which conviction he appeals to this court, alleging numerous grounds of error. We will only notice those which seem to be material, or require attention at this time.

49—53 KAS.

The first contention is that the discharge of the jury first impaneled is equivalent to a verdict of acquittal. It is true that the jeopardy of the defendant began when the jury were impaneled and sworn and the reception of evidence was commenced, and it is also true that the discharge of the jury without the consent of the defendant, and without sufficient reason, will ordinarily bar a further trial. The statute prescribes the grounds which will warrant the court in discharging a jury before the completion of a trial. It reads as follows:

"The jury may be discharged by the court on account of the sickness of a juror, or other accident or calamity requiring their discharge, or by consent of both parties, or after they have been kept together until it satisfactorily appears that there is no probability of their agreeing." (Civil Code, § 281; see, also, Crim. Code, § 208.)

In this case the sickness of a juror was the cause for discharge, and whether that sickness was of such a character as to make a discharge absolutely necessary, was the subject of inquiry and decision by the court. A court cannot arbitrarily determine such a question, but the incapacity of the juror and the necessity for discharge are to be heard and determined by judicial methods. (*The State v. Smith*, 44 Kas. 75.) That course was pursued in the present case, and the finding made by the court that such a necessity existed was based on the testimony of a physician and other evidence, some of which is not preserved. In the absence of that evidence, we cannot say that there was not good cause for the discharge. From what appears, we think that the court did not act capriciously, nor without a due regard for the rights of the defendant. After the illness of the juror was reported, the court postponed the trial from day to day, in the expectation that the juror would recover sufficiently to complete the trial. Several inquiries were made as to his condition and the prospect of recovery. At the end of five days he was still seriously sick, and his recovery was a matter of great uncertainty. It is said that the near approach of the end of the term influ-

enced the court, to some entent, in reaching the conclusion which it did. Of itself, this might not be sufficient to justify a discharge, but as the real inquiry was whether the sickness of the juror required the jury to be discharged, the finding of the court made upon this inquiry is necessarily binding upon us. As the testimony taken at the time of the discharge was made a part of the plea, and a demurrer thereto sustained, the question raised upon the reply to the plea is not deemed material.

*1. Discharge of jury—effect as acquittal.*

Upon leave of the court, obtained without notice to the defendant, the state was permitted, at the time of the trial, to indorse upon the information the names of eight witnesses who gave material testimony in the case. This indorsement was made just before the trial, on April 5, and it is contended that, as the testimony given by these witnesses was important, the action of the court in permitting the indorsement was an abuse of discretion, which resulted in prejudicing the rights of the defendant. It appears that on the 3d day of February a motion was made to indorse the names of the new witnesses, which motion was sustained by the court. Afterward the names of these witnesses so indorsed were stricken from the information, and it was said that it was done upon the ground that the order for indorsing the names of witnesses · was made in the absence of the defendant. It thus appears that the attention of the defendant and his attorneys was called to these witnesses, and, further, that inquiry had been made of them as to what their testimony would be. Under the circumstances, it cannot be said that the court exercised its discretion without due regard for the rights of the defendant, or that he was prejudiced by the ruling.

*2. Information—indorsement of names of witnesses—discretion of court.*

Three jurors were challenged on the ground that they did not possess the requisite qualifications of jurors. The objection urged is, that their names did not appear on the tax rolls of the county, and hence that they should have been excluded from the panel, upon the objection of the defendant. The showing made upon this point is not satisfactory. While it

appeared that these jurors did not pay any personal taxes for the preceding year, it was not shown that they did not pay taxes on real estate, nor that their names did not appear on the assessment rolls of their respective townships. It appears that two of them were listed for personal taxes, but that the value of the personal property which each had for taxation did not equal the exemption allowed to him; and in the case of the third, he stated that he had made a return for a stock company as its manager and agent, but that he had not been assessed for personal taxes. Whether he was upon the tax roll is not shown. No inquiry was made as to whether they had real estate listed in their names in the respective townships in which they lived, and nothing to show that they did not pay taxes on real estate for the preceding year. The statute provides for listing both personal and real estate in the name of the owner. (Gen. Stat. of 1889, ¶¶ 6889, 6911.) It is further provided, that in making a list of persons to serve as jurors the jury commissioners shall select from those assessed on the assessment rolls of the several townships and cities of the preceding year. (Gen. Stat. of 1889, ¶¶ 3567, 3601.) The evident purpose is to obtain the service of jurors who are substantial citizens and owners of property, and the assessment rolls referred to in the jury law are evidently those made in the listing of both real and personal property. As it does not appear that they were not upon the personal property assessment rolls, nor that they did not own and pay taxes on real estate, this objection must be overruled. (*The State, ex rel., v. Comm'rs of Rawlins Co.*, 44 Kas. 528.) Other objections were made with reference to the jury, but an examination discloses that they are not material.

3. Competency of jurors— payment of taxes.

The next complaint relates to the ruling of the court in admitting what was received as the dying declaration of the deceased. Hopper was shot by Reed about 5 o'clock on the evening of May 21, 1892, and soon afterward was carried to his home, where an examination of his wound was made by physicians and surgeons, who informed him that his injury

was fatal, and admonished him that if he had any business matters which required attention he should attend to them, as he could not live long. He repeatedly expressed the opinion that he was about to die. A minister of the gospel was called in. He requested a neighbor to act as guardian for his children, gave information about insurance on his life, and directed how it and his property should be applied. He suffered intense pain, and at times cried out, "I am dying now." A stenographer was sent for, and a dying statement as to the shooting, and the cause of it, was taken down, which was afterward introduced in evidence. Some time after the statement was given, he rallied some, and used language which indicated that he was then not without hope of recovery; but soon afterward he expired. It is claimed that, under the circumstances, the statement should not have been received in evidence. It is clear that the statement was made in the belief of impending death, and the fact that there was an interval of several hours between the time the statement was made and his death does not make it inadmissible. Nor will the fact that, at times after the statement was made, he entertained or expressed a hope that he might get well, render his declarations incompetent. The controlling question is, whether the declarations were uttered under a sense of impending dissolution, and the fact that death did not imediately ensue, or that a hope of recovery was subsequently entertained, will not affect their admissibility. (6 Am. & Eng. Encyc. of Law, 117.)

4. Homicide—dying declarations.

The admission of testimony showing the relations existing between the defendant and the wife of the deceased, and which tended to show a criminal intimacy between them, is assigned as error. The defendant admits that proof of a criminal intimacy between the defendant and the wife of the deceased is admissible to show the existence of a motive for the killing, at least in cases where the killing has to be established by circumstantial evidence; and he insists that, as the killing was admitted, the motive of the defendant could be

shown in a general way, but that a detailed inquiry would create new issues, and tend to divert the minds of the jury from the consideration of the principal issue; the theory of the prosecution being that the homicide was committed by the defendant because of the passion which he entertained for the wife of the deceased, of which the deceased had knowledge, and that, as he stood in the way of defendant carrying out his desires and purposes, testimony of the relations which existed between them was competent upon the question of motive. Counsel for the state say that it has been "universally conceded, since David wrote to Joab, 'Set ye Uriah in the forefront of the hottest battle, and retire ye from him, that he may be smitten, and die,' that the man who covets his neighbor's wife has a motive for desiring the death of his neighbor." The evidence is not only competent as tending to show the motive which induced the crime, but it is important also in determining the degree or grade of the crime that has been committed. As a general rule, testimony tending to show the commission of another offense than the one charged is not admissible; but where such offense is intimately connected with the one charged, important proof to establish the latter cannot be excluded because it may tend to prove that the defendant is guilty of another offense. (*The State v. Folwell*, 14 Kas. 105.)

5. Evidence— criminal intimacy—motive for killing.

6. Evidence— another offense than that charged.

There may be some cause for complaint at the very extended inquiry that was made as to the relations between the defendant and Mrs. Hopper. A detailed inquiry was made, and a large volume of testimony was taken. It may be said, however, that this was due, to a large extent, to the fact that an undue intimacy between these parties was denied by the defendant. The testimony of the illicit relation, however, if it existed, was receivable in evidence as tending to show the motive of the defendant in killing the deceased. (*Johnson v. The State*, 4 S. Rep. 535; *Pierson v. The People*, 79 N. Y. 424;

*Commonwealth v. Merriam*, 14 Pick. 518; *The State v. Lawlor*, 28 Minn. 216; *The State v. Hinkle*, 6 Iowa, 380; 9 Am. & Eng. Encyc. of Law, 714; 15 id. 936.

A more serious objection is made to interviews and conversations held with the deceased some time prior to the shooting, when the defendant was not present, and of which he had no knowledge. A witness was permitted to detail at length a meeting between himself and Hopper on the day before the shooting, the taking of a long drive with the deceased, during which he related to the witness his troubles at Wellington, and his plans for leaving that place and going to Missouri. He was allowed to testify what the mood and manner of the deceased were on that day, and to relate the reason given by the deceased for leaving Wellington. The reason stated was the interference in his family, and the trouble made by the defendant. Another witness, over objection, related that he had met the deceased on the next day, and had a conversation with him, in the absence of the defendant, in which the deceased informed him, among other things, that he had determined to go to Missouri, and the reason given was, "that if he could get his wife away from where Judge Reed was, they could get along all right together." The acts and conduct of the deceased previous to the fatal encounter which formed a part of the *res gestæ* or which tended to throw light upon the question of motive or malice might be admitted in evidence;

7. Conduct of deceased—inadmissible evidence.

but the acts or conduct of the deceased which are not a part of the *res gestæ* and which could not have influenced the defendant in the commission of the homicide cannot be shown. The manner and conduct of the deceased on the day previous to the killing were not known to the defendant and were not connected with the homicide, and therefore the defendant could not be affected thereby. Anything that would throw light on the homicide and everything that would operate on the mind of the defendant can be shown; but evidence of the acts or manner of the deceased which never came to the knowledge of the defendant could not be proved.

There was introduced in evidence a paper, identified by Mrs. Hopper, in which the deceased declared that he believed his wife to be a woman of honor, integrity, and high moral character, and that any accusations to the contrary were false. To meet the introduction of this evidence by the defendant, the state was permitted to offer a witness, who related an occurrence between himself and the deceased, on May 1, the day upon which the other paper was executed, in which the deceased presented to him a paper, which he said was prepared by Mrs. Hopper. He then gave a conversation between the deceased and himself with reference to the paper and its contents. After reading it over, the witness told the deceased that he would be a fool to sign it; that the paper was not prepared by Mrs. Hopper, but was prepared for the purpose of getting a divorce from him. A long conversation ensued, in which it was intimated, or would bear the construction, that a trap was being laid by the defendant and the wife of the deceased, so that, if trouble occurred or a divorce was asked for, the mouth of the deceased would be closed; and much of the contents of the paper was disclosed in the conversation. This testimony was wholly incompetent, and the objection of the defendant should have been sustained, and the motion to strike it out should have been allowed. If the testimony had been competent as an explanation of why the paper signed by the deceased came to be executed and delivered to his wife, it was still secondary evidence, and, if competent at all, the letter itself should have been produced, or its nonproduction accounted for. The paper itself, however, if in existence, was not competent proof, and the introduction of its contents was prejudicial error.

8. Paper not produced—contents in evidence—error.

There is just ground for the complaint made by the defendant in permitting the state to cross-examine the defendant in regard to his early life. A great part of the testimony in the case was devoted to the question of whether the defendant sustained adulterous relations with the wife of the deceased, and on cross-examination he was required to relate the mari-

tal relations between him and his first wife, having been married in 1868; that he was divorced from her in the spring of 1877; and to state the grounds upon which the divorce was granted. The inquiry was pressed so far that he was required to state that cruelty and adultery were charged against him, and an effort was made to show that his present wife was the co-respondent in that divorce suit, with whom adultery was charged, and that he was engaged to his present wife prior to the granting of the divorce from his first wife. Some of these direct questions were not required to be answered, but the inquiry was pushed sufficiently far to leave the inference with the jury that the defendant had been guilty of another adultery, with a person other than the wife of the deceased, 15 years before the occurrence of the homicide with which he was charged. A full cross-examination should be allowed upon anything connected with the homicide, or which would affect the credibility of the defendant as a witness, but it is not competent to prove previous acts of adultery which have no connection with the offense charged, nor can

9. Adultery— cross-examination, when limited. evidence of improper conduct with other parties than those charged in the information, which happened in his early life, be given in evidence to sustain the present charge. We think there was an abuse of discretion in this extended cross-examination of the defendant.

Another ground of complaint is the instruction given by the court with reference to the effect of the dying declaration which was admitted in evidence. The court charged that "such declaration, when made in the belief that death was imminent, and the deceased had abandoned all hope of recovery, is admissible; and in this case, if you should find from the evidence that the deceased made a declaration as to the encounter with defendant before his death, then the court instructs you as a matter of law that such declaration was made when deceased thought death was imminent, and he had abandoned all hope of recovery." The court further advised the jury that the weight to be given to the declaration, and

the credibility of the witness making it, ought to be governed by the ordinary rules of evidence, and, to determine the weight and credit to be given to the same, the jury can consider all the circumstances under which the declaration was made. The objection is, that the court withdrew from the jury all considerations as to whether the declaration was made when the deceased thought death was imminent, and after he had abandoned all hope of recovery. The court must decide as a preliminary question whether the declaration was made under a sense of impending dissolution, and the admissibility of the same is exclusively for the consideration of the court; "but, after the evidence is admitted, its credibility is entirely within the province of the jury, who, of course, are at liberty to weigh all the circumstances under which the declarations were made, including those already proved to the judge, and to give the testimony only such credit as, upon the whole, they might think it deserves." (1 Greenl. Ev., § 160.) While the court instructed the jury that they might take into consideration the circumstances under which the declaration was made, in another part of the charge the question of whether the deceased made the statement under the apprehension of speedy death was in effect excluded from their consideration. In passing upon the credibility of the statement, the jury are entitled to consider whether as a matter of fact the deceased had lost all hope of recovery, and the instruction should have been modified in accordance with this view. (*Starkey v. The People*, 17 Ill. 17; *North v. People*, 139 id. 102; *The State v. Cameron*, 2 Pinney, 490; *Varnedoe v. The State*, 75 Ga. 181; *The State v. Banister*, 14 S. E. Rep. 678; *Lambeth v. The State*, 23 Miss. 355; *Nelms v. The State*, 13 Smed. & M. 506; *People v. Green*, 1 Parker, Cr. Rep. 11; *Walker v. The State*, 37 Tex. 366; *Jones v. The State*, 71 Ind. 66; *The State v. Nash*, 7 Iowa, 347, 384.)

Another complaint is with reference to an instruction given upon the subject of self-defense, in which the court told the jury that, if one is unlawfully attacked by another, he may

10. Dying declarations—admissibility for court, credibility for jury.

stand his ground and use such force as reasonably appears necessary to repel the attack and protect himself. The criticism is that the instruction given leaves the jury to infer that the appearances were to be judged by them, and not by the defendant. "A party assailed is justified in acting upon the facts as they appear to him, and is not to be judged by the facts, as they are." (*The State v. Howard*, 14 Kas. 175.) While the instruction is not as explicit as it should have been, it is evident from other portions of the charge that the court meant that he might use such force "as at the time reasonably appeared to him to be necessary." Although the instruction is defective, we would hardly think that the error of itself was sufficient to require a reversal. In any future trial of the cause this omission can be corrected.

*11. Self-defense —justifiable action.*

There is a further complaint that the court failed to submit an instruction upon manslaughter in the second degree. As the instruction complained of related to a degree of crime inferior to that of which the defendant is convicted, this objection becomes immaterial. (*The State v. Dickson*, 6 Kas. 209; *The State v. Potter*, 15 id. 302; *The State v. Rhea*, 25 id. 576; *The State v. Yarborough*, 39 id. 588.) Further than that, however, we think the testimony was not such as to justify the court in submitting an instruction as to that grade of offense.

Other criticisms are made upon the charge of the court, but in them we find no error, nor anything which requires further comment. For the errors referred to, the judgment will be reversed, and the cause remanded for another trial.

All the Justices concurring.