THE STATE OF KANSAS v. JOHN C. MOORE.

No. 15,670. (95 Pac. 409.)

SYLLABUS BY THE COURT.

1. CRIMINAL LAW—*Evidence—Collateral Facts.* In the trial of criminal cases the evidence should be confined to the question in issue; facts collateral to, and not connected with, the subject being investigated are not admissible.

2. ———— *Instructions.* Instructions examined and approved.

Appeal from Cowley district court; CARROLL L. SWARTS, judge. Opinion filed April 11, 1908. Reversed.

*Fred S. Jackson,* attorney-general, and *Ed J. Fleming,* county attorney, for The State; *A. M. Jackson,* and *A. L. Noble,* of counsel.

*Adams & Adams,* and *L. C. Brown,* for appellant.

The opinion of the court was delivered by

GRAVES, J.: On December 27, 1906, J. C. Moore was convicted in the district court of Cowley county of murder in the first degree for killing his wife, Clara C. Moore. A motion for a new trial was denied, sentence was pronounced, and the defendant appeals to this court. Thirty-seven assignments of error have been presented, but as several of them relate to the same questions it will be unnecessary to consider them in detail.

Complaint is made of the district court for admitting evidence of domestic troubles between the defendant and deceased existing years prior to the homicide and in no way relating thereto. Mrs. Edith McCullough, a daughter of the deceased, and a stepdaughter of the defendant, testified to profane and vulgar language used by the defendant to her mother at different times during a period beginning more than twelve years before the commission of the crime charged; also, that in 1901 he put the witness and her mother out of the house and upon the porch.

Mrs. Moore was a member and regular attendant of the Baptist church. This practice on her part was violently opposed by her husband. To prevent her churchgoing, he made threats of violence against her and used vulgar and profane language concerning her and other churchgoing people. This conduct of the defendant became so persistent and violent that the deceased left him, and on March 27, 1901, she commenced a suit for divorce and alimony, alleging extreme cruelty. The defendant answered and alleged that they had a family controversy concerning a "Carrie Nation crusade" then being conducted in the city, in which he and the deceased, with her daughter Edith, were in opposition, and the conduct and talk of Edith so irritated him that he put her out of the house. On April 19, 1901, Mrs. Moore obtained a de-

47—77 KAN.

cree of divorce and for alimony. A motion for a new trial was allowed June 4, 1901. The case was then dismissed by Mrs. Moore, and the parties resumed their marital relations. The reason for this reconciliation is given by one of the witnesses as follows:

"Why, I have heard her say before him, that she came back because he promised to do right and promised to go to church with her. I have heard her ask him to go to church with her; I have heard her offer to go to other churches, other than the Baptist church, with him, and I heard her say that he promised to and heard him say that he would n't go; I have heard her ask him to go a number of times and told him that she came back to live with him because he promised to be a man and promised to do what was right."

Some time afterward, and during the year 1901, Mrs. Moore, her daughter Edith, R. B. McCullough, who afterward married Edith, and his sister started to attend an entertainment at Chilocco, an Indian school a few miles away. The defendant followed, overtook them, and compelled his wife to return. It appears that the defendant was very much opposed to the relations then existing between Edith and McCullough. The occurrence is described by McCullough thus:

"My sister had come to town and there was an entertainment at Chilocco; she drove in with a horse and buggy, and Edith Tombs proposed that we go to Chilocco and that her mother would like to go. I had no objections and I told her I would go with my sister; I took my horse and buggy down to John Moore's house and Mrs. Moore and Edith Tombs—Tombs then—got in the buggy; just as they were driving away John Moore came up and he hollered something at them—I don't just remember what it was—and they drove on in a way that they did n't hear him, or went anyway, and he then jumped on to me and cursed me and shook his fist in my face and accused me of trying to take his wife out of town. I tried to argue the question with him. I told him I was n't and I supposed he knew she was going also, and they were just going to Chilocco to an entertainment and would be back, but he paid no attention to my plea and I walked away and

left him alone, went up town to my sister, where she was· in the buggy at a livery-barn, I think, and we hitched up and drove on to Chilocco and overtook them and passed them and was in the lead when some one drove up from behind and came around in front ·of Mrs. Moore and her daughter, and I drove on a. little, not very far, and stopped; I heard him order her to get out of the buggy and go back to town with him, which she refused to do; but her daughter got out of the buggy and came and got in the buggy with me and my sister, and Mrs. Moore turned to go back to town; he also turned, and as he turned he put his hand on his hip pocket and turned to me as he said: 'For two cents and a half I would put a hole through you.' I drove on, and they drove back to town, and I seen no more of them that day."

Minnie Tombs, another daughter of the deceased, testified substantially the same as her sister Edith concerning the treatment of her mother by the defendant years before the homicide.

On January 1, 1906, another separation having taken place, the deceased caused the defendant to be arrested, for the purpose of compelling him to give a bond to keep the peace. In her verified complaint she stated that the defendant had made threats to assault and kill her, and she was afraid he would do so.

The state introduced in evidence the verified answer of the defendant in the divorce suit, the decree, the order granting a new trial, and the order of dismissal. The complaint in the peace proceedings and the warrant issued therein, with the return thereon showing the arrest of the defendant, were also introduced. It was then shown by the statement of the justice of the peace that the defendant was committed to jail, but that when the case came up for trial, the prosecutrix refusing to appear, it was dismissed.

It is urgently insisted that this evidence was irrelevant and prejudicial. We are unable to see the theory upon which it was admitted. The deceased was killed October 21, 1906, in open daylight, on a public street and in the very presence and sight of numerous

people. The fact that the defendant did the killing in manner and form as charged was not disputed. It is difficult to see how the vulgar and profane utterances of the defendant made twelve years before would throw any light upon the homicide. When the decree of divorce was set aside in 1901, and the parties resumed their marital relations, it would seem that all past differences were reconciled and condoned. After the defendant had been arrested upon the complaint of his wife and she refused to appear against him there was another reconciliation, and they again resumed the relations of husband and wife, which continued until about a year before the homicide. How far collateral facts may be properly admitted in evidence depends upon the peculiar features of the case being tried. Usually such evidence is confined to cases where the prosecution is required to resort to circumstantial evidence to connect the defendant with the offense, in which case motive, the former relations of the parties and threats and admissions of the defendant are important; but no such necessity exists here. The proceedings in the divorce case and in the application to compel defendant to give a peace bond seem quite remote and foreign to the homicide. The natural effect of this class of evidence is to inflame and prejudice the minds of the jury against the defendant on account of former cruelty and brutality in no way connected with the homicide, so that a fair consideration of his defense would be difficult, if not impossible. It is a familiar and elementary rule that evidence must be confined to the point in issue. Collateral facts not directly connected with the subject under investigation are inadmissible. (21 Cyc. 929, 930; 1 Ell. Ev. § 175; *Sutton v. Johnson,* 62 Ill. 209; *Farris v. The People,* 129 Ill. 512, 21 N. E. 821, 4 L. R. A. 582, 16 Am. St. Rep. 283; *Nickerson v. Gould,* 82 Me. 512, 20 Atl. 86; *State v. Brantley,* 84 N. C. 766; *People v. Sharp,* 107 N. Y. 427, 14 N. E. 319, 1 Am. St. Rep. 851.) In the

syllabus of the case of *Raines v. State,* 81 Miss. 489, as reported in 33 South. 19, it was said:

"In a prosecution for wife murder, evidence that accused had for ten years before the alleged crime cursed and ill-treated his wife, and committed many simple assaults upon her, was improperly admitted."

In the syllabus of the case of *Billings v. State,* 52 Ark. 303, as reported in 12 S. W. 574, it was said:

"Evidence concerning a difficulty between the defendant and the deceased which occurred two and a half years before the homicide is irrelevant, where no connection is shown between the two events, and, being prejudicial to the defendant, is reversible error."

In the opinion in the state report it was said:

"The general rule is well established, in civil as well as in criminal cases, that evidence shall be confined to the issue.  It seems that the necessity for the enforcement of the rule is stronger in criminal cases.  The facts laid before the jury should consist exclusively of the transaction that forms the subject of the indictment, and matters relating thereto.  To enlarge the scope of the investigation beyond this would subject the defendant to the dangers of surprise against which no foresight might prepare and no innocence defend. Under this rule it is generally improper to introduce evidence of other offenses; but if facts bear upon the offense charged, they may be proved, although they disclose some other offense.  The test of admissibility is the connection of the facts offered with the subject charged."  (Page 309.)

The conduct of the defendant was consistent with the theory of insanity, and that was his defense.  There was substantial evidence to sustain this claim, and we are unable to say that the jury were not influenced to the defendant's prejudice by this improper testimony.

We have examined the instructions requested by the defendant and refused by the court, as well as those given by the court and objected to by the defendant, and are unable to find any error in the action of the court in respect to either.  The instruction given by the

court on the subject of insanity, to which objection is made, when taken in connection with the other instructions given upon that subject, is fairly in harmony with the rule followed by the courts generally, and as heretofore adopted by this court. (*The State v. Mowry,* 37 Kan. 369, 15 Pac. 282; *The State v. Nixon,* 32 Kan. 205, 4 Pac. 159.) The rule as to dying declarations was correctly stated by the trial court. (*The State v. Reed,* 53 Kan. 767, 37 Pac. 174, 42 Am. St. Rep. 322.)

We think substantial error was committed by the admission of evidence concerning remote and collateral facts, as shown by the testimony of witnesses Edith McCullough, Minnie Tombs, R. B. McCullough, G. H. McIntire, and the partial record in the legal proceedings. This conclusion will require a reversal. The other questions presented need not be considered.

The judgment of the district court is reversed, and the case is remanded with directions to grant a new trial.