Argued May 27, decided June 24, 1913.

## PACIFIC ELEVATOR CO. *v.* PORTLAND.*

(133 Pac. 72.)

**Statutes—Construction of Granting Terms—Construction of Wharves into Navigable Waters.**

1. A statute in the present tense is usually construed to apply to matters within its terms that may come into existence after its passage during the life of the statute, as well as to matters existing when the law is enacted. Thus, Sections 5201 and 5202, granting to the owners of land bordering upon navigable streams, and within the limits of incorporated towns, the right to construct wharves thereon

---

*The question of the title to land under water is considered in a note in 42 L. R. A. 161, and as to the title to bed of navigable river, see notes in 53 Am. St. Rep. 289; 1 L. R. A. (N. S.) 762.

For the right of a state to grant tide lands, see note in 22 L. R. A. (N. S.) 337.

On the right to erect wharves generally, see note in 40 L. R. A. 635.
—REPORTER.

and extend them out to navigable water, subject to certain restrictions, being in the present tense, applies to upland that was without the incorporation when the act was passed, whenever the boundaries of the city shall be extended beyond such land, so long as the statute is unrepealed.

### Statutes—Meaning of "Seashore" and "Coast."

2. The words "seashore" and "coast," used in a statute relating to tide and overflowed land, may mean such land along a river where the water rises and falls on account of the tide, though it be as much as a hundred miles from the ocean.

### Constitutional Law—Presumption of Validity.

3. The presumption is always in favor of the validity of a legislative act, and its clear repugnancy to the Constitution must be shown, particularly where the act has remained unquestioned for many years and large investments have been made in reliance upon its terms.

### Statutes—Relation of Title to Subject—Constitution.

4. The title of a statute will be sufficient if the matter is reasonably connected with and germane to the title, under Article IV, Section 20, of the Constitution requiring an act to embrace but one subject and matters connected therewith, which subjects must be expressed in the title.

> [As to the sufficiency of the titles of statutes within constitutional requirements, see notes in 64 Am. St. Rep. 70; 79 Am. St. Rep. 456; 86 Am. St. Rep. 267.]

### Title of Statute—"Sale."

5. An act "to provide for the sale" of certain classes of state lands is not void on account of a defective title because it gave such lands to the owners of adjoining property, since the word "sale" may be considered as evincing merely an intention to dispose of the lands rather than to obtain money for them. Thus construed the subject matter of the act is not foreign to its title.

### Statutes—Title and Subject—Constitution.

6. Laws of 1872, page 129, entitled "An act to provide for the sale of tide and overflowed lands on the seashore and coast," gave the owners of lands fronting on the seashore and coast the preference right to purchase the tide and overflowed land from the state. The act of October 26, 1874 (Laws 1874, p. 76), without changing the title, incorporated as an amendment that the Willamette River should not be deemed a river in which the tide ebbed and flowed, and granted the title of the state to tide and overflowed lands upon that river to the owners of adjacent lands. Laws of 1876, page 69, amended the act of 1874 so as to include within its provisions three other rivers. *Held*, that the amendatory acts were not contrary to Article IV, Section 20, of the Constitution, requiring every act to embrace but one subject which shall be expressed in its title, since the words "seashore" and "coast" used in the title of the original act were broad enough to include tide and overflowed lands along rivers emptying into the ocean, and, while "sale" does not include the disposing of lands without a money consideration, their disposal in that manner is not foreign to the subject expressed in the title of the original act.

**Statutes—Titles of Acts—Amending Act.**

7.   Where an act, entitled "An act for the sale of overflowed and tide lands," was subsequently amended to provide for the disposal without consideration of such lands along a particular river, and again amended to apply the first amendment to other rivers, and the title to the last amending act included the original act and the first amendment, there can be no mistake as to its meaning, and the statute is not unconstitutional as a violation of Article IV, Section 20, of the Constitution, requiring the subject matter of every act to be embraced in the title.

**Statutes—Implied Repeal—Repugnant Act—"Repeal by Implication."**

8.   For a repeal of a statute by implication there must be such a positive repugnancy between the new and old statutes that they cannot stand together, repeals by implication being not favored.

**Navigable Waters—Legislative Grant—Repeal—Wharves and Docks.**

9.   The Charter of the City of Portland, Section 216, provides that all the wharves, waterfront, and harbor shall be under the control of the executive board, subject to ordinance, and Section 73, Subdivision 78, gives the council power to provide for the construction of wharves. The department of public docks created by the amendment to the Charter, Section 18, adopted in 1910, selected a wharf site on the Willamette River adjoining shore lands owned by the plaintiff, who had not constructed a wharf in front of its premises under the right granted by the wharf act (L. O. L., §§ 5201, 5202), which was not expressly repealed by the charter. *Held,* that the charter does not repeal the wharf act by implication, since it does not necessarily authorize the city to use all portions of the state's property that might be reasonably necessary for the construction of wharves, but can be construed so as to authorize only the construction of wharves where the rights of others under the wharf act will not be interfered with.

**Statutes—Repeal by Implication.**

10.   A statute covering the subject of a previous law and enacted for the same purpose as the first, may operate to repeal the former without even referring to it; but where the two statutes are intended to accomplish different purposes, there is no implied repeal, even though both relate to the same subject.

[As to the repeal of statutes by implication, see note in 88 Am. St. Rep. 271.   As to the effect of a simultaneous repeal and re-enactment of statute, see note in Ann. Cas. 1912D, 539.]

**Navigable Waters—Line of Ordinary High Water.**

11.   The line of ordinary high water is the line at which the presence of water in ordinary years gives to the soil and vegetation an appearance and character different from the banks above it.

**Appeal and Error—Effect of Findings in Equity.**

12.   The findings of the trial judge in an equitable proceeding will not be disturbed on appeal, where the evidence indicates that they are correct.

**Public Lands—Navigable Waters—Construction of Grant.**

13. A public grant of land adjoining navigable waters is construed to be a grant of dry land only, and is bounded by the high-water mark; but when the grant is of land under water, it will be so construed as to make it effective for some purpose, and a consideration of the surrounding circumstances is often necessary to determine such purpose.

**Navigable Waters—Ownership by State of Land Below High-water Mark.**

14. Upon being admitted into the Union, the State of Oregon became by that act the owner of the bed of the Willamette River and of the banks thereof below ordinary high-water mark, subject only to the right of Congress to regulate interstate and foreign navigation thereon.

**Navigable Waters—Severance of Wharf Rights.**

15. Where owners of wharf privileges attached to upland plat property, both above and below ordinary high-water mark, into lots and blocks, and convey the property with reference to the map, the wharf rights become thereby attached exclusively to the outside lots.

**Navigable Waters—Right of Upland Owners to Wharf Across State Land to Harbor Line.**

16. The act of 1862, now Section 5201, L. O. L., which grants to riparian owners on navigable streams the right to wharf out to the harbor line across the property of the state lying below ordinary high-water mark, is in aid of navigation and commerce, and therefore a valid use of the property that came to the state upon its being granted statehood.

[As to the relative rights of the state and of riparian owners in navigable waters, see note in 127 Am. St. Rep. 40.]

[As to what waters are navigable, see note in 126 Am. St. Rep. 710.]

**Navigable Waters—Lands Under Water—Tide Lands and Flats.**

17. Under Laws of 1874, page 76, as amended by Laws of 1876, page 69, granting to riparian owners along the Willamette and other rivers the title to tide and overflowed lands, the owner of lots between a city street and the river, which originally consisted of a low flat, but which had been filled up and which the trial court found were above the line of ordinary high water, succeeds to the title of the state in such flats, subject to the right of navigation and to the reasonable regulation thereof by the state through the municipality.

**Eminent Domain—Compensation for Riparian Rights.**

18. A wharf right granted by the state to an upland owner on a navigable stream, though unused, is property for which compensation must be made, under Article I, Section 18, of the Constitution, if it is to be taken for public use.

**Navigable Waters—Lands Under Water—Grant by State—Restrictions.**

19. The restrictions upon the conveyance by the state of lands under navigable streams generally apply to lands below ordinary low-water mark or the bed of the stream proper and not to the bank or shore.

From Multnomah: ROBERT G. MORROW, Judge.

Statement by MR. JUSTICE BEAN.

This is· a suit by the Pacific Milling & Elevator Company to restrain the City of Portland, the dock commission of said city and its members, from erecting a wharf on and in front of plaintiff's premises below the line of ordinary high water in the Willamette River. The defendants appeal from a decree of the Circuit Court adjudging plaintiff to be the owner of the premises and of the wharfage rights in front thereof.

Plaintiff avers that it is the owner and in the actual possession of the following described real estate, water frontage, and wharfage rights situated within the corporate limits of the City of Portland, to wit: The northerly 55 feet of lot 17, all of lots 18, 19, and 20 of Watson's Addition to the City of Portland, and the southerly 40 feet of lot 21 of Doscher's Addition to the above city; that the lots are 200 by 100 feet, extending from Front Street at a point above and westerly of the line of ordinary high water in the left bank of the Willamette River easterly to the established harbor line; that plaintiff is entitled and desires to construct a wharf on and in front of the premises, and has applied to the defendant City of Portland for a permit to do so, but has been refused the same on the ground that the city asserts that it has the exclusive right of constructing a wharf on all that part of the premises below the line of ordinary high water; and that, pursuant to such claim, the dock commissioners of the defendant city have selected the premises for a wharf site, have entered upon such river frontage, have engaged in driving piles therein preparatory to the construction of a wharf and dock, and threaten to occupy such premises permanently and to exclude

plaintiff therefrom. The defendant city and its officers deny plaintiff's title and allege, among other things, that the property described in plaintiff's complaint has never been in the actual possession of anyone; that the whole thereof, including all of North Front Street adjacent thereto, has at all times been below the ordinary high-water line of the Willamette. River, and that the same accrued and became vested in the State of Oregon at the time the state was admitted into the United States, and that it has never sold or conveyed the same to anyone; that the State of Oregon by its Constitution and through the Charter of the City of Portland adopted in 1903, and a certain amendment thereto, establishing a department of public docks and making provisions with reference thereto, adopted by the people of the City of Portland November 8, 1910, pursuant to the Constitution, granted unto the city the right, power, and authority to construct and maintain wharves, docks, and all appurtenances thereto upon the property of the State of Oregon lying below the ordinary high-water line of the Willamette River, particularly upon such portions thereof as a commission of the department of public docks of the city might select; that the commission has duly selected the property described in the complaint for that purpose, and intends to erect thereon a large dock extending from ordinary high-water line out to the harbor line, and to take possession of the whole of such frontage and premises without paying plaintiff any compensation therefor. The plaintiff asks that its title to the premises be quieted, and that defendants be enjoined from erecting or maintaining any structure thereon.

The state intervened and alleges, in substance, in addition to the facts stated by the defendant City of Portland, that it is the owner of all the land between

the ordinary high-water mark and the harbor line in front of and on the river side of such lands; that the City of Portland and its dock commission are fully authorized by the grant in its charter to enter upon and construct below high-water mark a public dock and wharf for the purpose of aiding and promoting the commerce and navigation of the Willamette River; that in attempting to construct a public dock the City of Portland is acting by virtue of such authority; that the plaintiff has no franchise or license to construct wharves or docks in front of such lands below ordinary high-water mark; that such license or franchise has been forfeited, abandoned, and lost for more than ten years prior to the commencement of this suit; and that plaintiff and its predecessors have in no wise attempted to use the same during such time. The state prays that it be declared to be the exclusive owner of the property, except as to the City of Portland, and that plaintiff be enjoined from driving piles in or building any structure upon the land below high-water mark or from asserting any claim to the land adverse to the intervener.

The following matters are agreed to: (1) That Watson's Addition to the City of Portland was platted March 7, 1871, by A. J. Watson, the owner of all the land included within its boundaries above the line of ordinary high water. (2) That Doscher's Addition to said city was platted April 11, 1871, by John C. and Ann L. Doscher, the owners of all the land within its boundaries above ordinary high-water line. (3) That both of said additions were platted on a part of the donation land claim of Wm. Blockinstone, and that the easterly boundary of said claim was the Willamette River, which is navigable. That said plats are contiguous, Doscher's Addition joining Watson's Addition on the north, and being a continuation there-

of so far as "river block" in the latter addition is concerned; "river block No. 2" of Doscher's Addition being a continuation of "river block" in Watson's Addition, and both of said additions being bounded on the west by Front Street. (4) That the plat of Watson's Addition shows the left boundary line of the Willamette River extending northerly and southerly practically through the middle of said "river block." (5) That, according to the field-notes of the survey of the donation land claim, the meander line of said claim is located about 40 feet easterly of and practically parallel with Front Street. (6) That plaintiff has succeeded by mesne conveyances to whatever title Watson and the Doschers had to lots 18, 19, and 20, and the northerly 55 feet of lot 17 of said "river block," and the southerly 40 feet of lot 21 of said "river block No. 2," and, if the lots are entirely below the ordinary high-water line of the river, plaintiff has nevertheless acquired and owns all the rights of the bank or upland property to such lots and parts of lots and the frontage thereof. (7) That all such title and right as the owner of the land adjacent to the line of ordinary high water in the Willamette River might have under the land is vested in the plaintiff so far as concerns the premises in front of lots 26, 27 and 28 of terminal block in Watson's Addition.

The evidence shows that there is a large area of similar land in the city, much of it occupied as private property, and all held in private ownership. D. B. Sigler, for about 14 years county assessor, testified that the land between ordinary high and low water marks has always been assessed; that there is $25,-000,000 or $30,000,000 invested in such lands and structures thereon. It appears that the plaintiff paid $137,000 for the lots five years ago. Since 1909 the assessed valuation has been from $74,750 to $91,250.

In 1910 the taxes amounted to $2,007.50. The land in question, in its original state, consisted of a low flat broken by a spring branch or creek, and for the last 25 years has been gradually filling up, so that much of it is now 15 feet higher than it was formerly. The lots immediately to the south, which are in the same class of property as the land in question, are occupied by a horse barn, blacksmith-shop, engine-house, a bridge company's plant, comprising an investment of several thousand dollars, and other buildings. The city first commenced an action to condemn the right to construct a wharf on the premises, which action was dismissed.                    AFFIRMED.

For the appellants there were oral arguments by *Mr. Frank S. Grant,* City Attorney, *Mr. Frederick W. Mulkey,* and *Mr. Lyman E. Latourette,* with briefs over their names to this effect.

Plaintiff claims rights as follows:

(1) Title in fee by patent from the government and subsequent conveyances as to the westerly 100 feet, which plaintiff claims has always been above the ordinary high-water line, or is now above such line by reason of accretion.

(2) Title in fee from the State of Oregon by an act of the legislature, and subsequent conveyances to a strip about 100 feet wide east of and adjacent to the above, being between the ordinary high-water line and the low-water line as claimed by plaintiff.

(3) Riparian or littoral rights and a wharf right to the portion below low-water line and the established harbor line.

Defendants, in answer to the first claim, maintain that the *locus in quo* belongs to the State of Oregon, because it is entirely below the ordinary high-water line, which is westerly of North Front Street, al-

though the apparent line is now near the easterly line of North Front Street, owing to a fill made in North Front Street in 1902–3, but this fill in the street could not have the effect of depriving the state of its title.

In answer to the second claim the defendants maintain (1) that the *locus in quo* is river shore and not "tide or overflowed lands" within the meaning of the acts of 1872, 1874 and 1876; and (2) that, in any event, this portion of the act is void because not embraced in the title.

In answer to plaintiff's third claim defendants maintain (1) that the state's ownership of the bed and shores of a navigable river is absolute, admitting of no easement on the part of the adjacent upland owner; and (2) that the wharf act (L. O. L., §§ 5201, 5202) creates only a permit or license to the upland owner to wharf out, but as plaintiff has not built any wharf, it has not acquired a vested right, and the license or permit conferred by the statute has been impliedly revoked by the action of the City of Portland in selecting this property for a municipal dock site under legislative authority and beginning the work of construction; and (3) that littoral or wharf rights are subject to the right of the state and its agencies (in this case the City of Portland) to construct docks and other improvements in aid of navigation and commerce.

## I.

*As to Plaintiff's Claim of Title from the Government.*

1. The State of Oregon, upon its admission into the Union, became the owner of the bed and banks of the Willamette River up to the line of ordinary high water, subject only to the paramount right of navigation and the right of Congress to regulate commerce between the states: 8 Enc. U. S. Sup. Ct. Rep., p. 840; 1 Dillon, Mun. Corp. (5 ed.), § 264; 1 Lewis, Em.

Dom. (3 ed.), § 94; *Hinman* v. *Warren,* 6 Or. 409; *Parker* v. *Taylor,* 7 Or. 436; *Parker* v. *Rogers,* 8 Or. 184; *Shively* v. *Parker,* 9 Or. 500; *De Force* v. *Welch,* 10 Or. 507; *Wilson* v. *Welch,* 12 Or. 353 (7 Pac. 341); *Andrus* v. *Knott,* 12 Or. 501 (8 Pac. 763); *Johnson* v. *Knott,* 13 Or. 308 (10 Pac. 418); *McCann* v. *Oregon Ry. Nav. Co.,* 13 Or. 455 (11 Pac. 236); *Parker* v. *West Coast Pack. Co.,* 17 Or. 510 (21 Pac. 822, 5 L. R. A. 61); *Bowlby* v. *Shively,* 22 Or. 410 (30 Pac. 154); *Lewis* v. *City of Portland,* 25 Or. 133 (35 Pac. 256, 22 L. R. A. 736, 42 Am. St. Rep. 772, 46 Am. & Eng. Corp. Cas. 230); *Montgomery* v. *Shaver,* 40 Or. 244 (66 Pac. 923); *Johnson* v. *Tomlinson,* 41 Or. 198 (68 Pac. 406); *Muckle* v. *Good,* 45 Or. 230 (77 Pac. 743); *Oregon* v. *Portland Gen. Elec. Co.,* 52 Or. 502 (95 Pac. 722, 98 Pac. 160); *Switzler* v. *Earnheart,* 59 Or. 344 (117 Pac. 297); *Micelli* v. *Andrus,* 61 Or. 78 (120 Pac. 737); *Sun Dial Ranch* v. *May Land Co.,* 61 Or. 205 (119 Pac. 758); *Shively* v. *Bowlby,* 152 U. S. 1 (38 L. Ed. 331, 14 Sup. Ct. Rep. 548); *Frost* v. *Washington County R. Co.,* 96 Me. 76 (51 Atl. 806, 59 L. R. A. 68).

2. The line of ordinary high water is the line to which the water rises in a season of ordinary high water, or the line at which the presence of water is continued for such a length of time as to mark upon the soil and vegetation a distinct character: *Johnson* v. *Knott,* 13 Or. 308, 310 (10 Pac. 418); *Sun Dial Ranch* v. *May Land Co.,* 61 Or. 205 (119 Pac. 758, 761); *Howard* v. *Ingersoll,* 13 How. (U. S.) 426 (14 L. Ed. 208).

The premises in question are, and were at the time of the plat, entirely below the line of ordinary high water, as the testimony and exhibits show. The premises therefore belong to the state unless it has in some way lost title thereto.

3. It appears that North Front Street and the adjacent property was partly filled in 1902–3, and that a bulkhead designed to keep back the earth broke and these lots were partially covered, so that now the level of the lots is slightly above the ordinary high-water line along part of the westerly line back from the water's edge.

This filling, however, did not operate to transfer the title of the state either to plaintiff or to the adjacent upland owner, since it appears that the property in its natural state was wholly below the ordinary high-water line: Lewis, Em. Dom. (3·ed.), § 86; 1 Farnham, Waters (1 ed.), § 75; *Diedrich* v. *Northwestern etc. Ry. Co.,* 42 Wis. 248 (24 Am. Rep. 399); *Illinois Cent. R. Co.* v. *Illinois,* 146 U. S. 387 (36 L. Ed. 1018, 13 Sup. Ct. Rep. 110); *Sweeney* v. *Shakespear,* 42 La. Ann. 614 (7 South. 729, 21 Am. St. Rep. 400); *Commonwealth* v. *Young Men's C. A.,* 169 Pa. 24 (32 Atl. 121); *Board of Park Commrs.* v. *Taylor,* 133 Iowa, 453 (108 N. W. 927, 930); *People* v. *Commissioners of Land Office,* 135 N. Y. 447 (32 N. E. 139); *Saunders* v. *New York Cent. & H. R. R. Co.,* 144 N. Y. 75 (38 N. E. 992, 43 Am. St. Rep. 729, 26 L. R. A. 378); *Sage* v. *City of New York,* 154 N. Y. 61 (47 N. E. 1096, 61 Am. St. Rep. 592, 38 L. R. A. 591); *De Lancey* v. *Hawkins,* 163 N. Y. 587 (57 N. E. 1108); *People* v. *Delaware & H. Co.,* 135 N. Y. Supp. 339.

## II.

*As to Plaintiff's Claim of Title from the State.*

1. This claim is based on the amendments of 1874 and 1876 to the tide land act, so called, of 1872 (Laws 1872, p. 129; Laws 1874, p. 76; Laws 1876, p. 70), which purports to grant the "tide or overflowed lands on the Willamette River" to the adjacent upland owners. The property in question here is not such land, but

river shore, as the testimony and exhibits show, so that the state was not by that act divested of its title: *Andrus* v. *Knott,* 12 Or. 501 (8 Pac. 763); *Johnson* v. *Knott,* 13 Or. 308, 312 (10 Pac. 418); *Oregon* v. *Portland Gen. Elec. Co.,* 52 Or. 502 (95 Pac. 722, 98 Pac. 160); *Van Dusen Invest. Co.* v *Western Fishing Co.,* 63 Or. 7 (124 Pac. 677, 126 Pac. 604).

2. Even if the amendments had applied to the premises in question, both are void in so far as they attempt to grant lands along the Willamette River, because the title of neither one relates to the granting of any land along the Willamette River—on the contrary, it relates to the sale of land on the seashore and coast. So much of the amendments, therefore, as relates to the granting of lands is void as in conflict with Article IV, Section 20, of the Constitution which provides that any subject not expressed in the title of an act shall be void: *State* v. *Shaw,* 22 Or. 287 (29 Pac. 1028); *Hearn* v. *Louttit,* 42 Or. 572, 575 (72 Pac. 132); *People* v. *Gadway,* 61 Mich. 285 (28 N. W. 101, 1 Am. St. Rep. 578); *Eaton* v. *Walker,* 76 Mich. 579 (43 N. W. 538, 6 L. R. A. 102); *State* v. *Tibbets,* 52 Neb. 228, (71 N. W. 990, 66 Am. St. Rep. 492); *State* v. *Board,* 22 Nev. 399 (41 Pac. 145) *Hyman* v. *State,* 87 Tenn. 109 (9 S. W. 372, 1 L. R. A. 497); *Case* v. *Loftus,* 43 Fed. 839 (5 L. R. A. 684); *State* v. *Fulks,* 207 Mo. 26 (105 S. W. 733, 15 L. R. A. (N. S.) 430, 13 Ann. Cas. 732); note in 64 Am. St. Rep. 76.

3. Where an existing act is amended, nothing can be incorporated in the amendatory act which is not embraced in the title of the original act: *Ex parte Howe,* 26 Or. 181, 184 (37 Pac. 536, 25 L. R. A. 663); *Yellow River Imp. Co.* v. *Arnold,* 46 Wis. 214 (49 N. W. 971); *Hatfield* v. *Commonwealth,* 120 Pa. 395 (14 Atl. 151, 6 Am. St. Rep. 711); note in 64 Am. St. Rep. 78–80.

## III.

*As to Plaintiff's Claim of Riparian and Wharf Rights.*

This claim is not well taken, for the following reasons:

1. The state's ownership of the bed and shores of navigable rivers is not subject to an easement of access to and from the river in favor of the adjacent upland: *Bowlby* v. *Shively,* 22 Or. 410, 420 (30 Pac. 154); *Galveston* v. *Menard,* 23 Tex. 349; *Stevens* v. *Paterson etc. R. Co.,* 34 N. J. L. 532 (3 Am. Rep. 269); *Eisenbach* v. *Hatfield,* 2 Wash. 236 (26 Pac. 539, 12 L. R. A. 632); *Gray's Harbor Boom Co.* v. *Lownsdale,* 54 Wash. 83 (102 Pac. 1041, 104 Pac. 269); *Lownsdale* v. *Gray's Harbor Boom Co.,* 54 Wash. 542 (103 Pac. 833); *Bilger* v. *State,* 63 Wash. 457 (116 Pac. 19, 22); *Shively* v. *Bowlby,* 152 U. S. 1 (38 L. Ed. 331, 14 Sup. Ct. Rep. 548).

2. The wharf act of 1872 created only a permit or license to the upland owner to wharf out, which must be used or lost. No wharf was ever built and no right accrued for which compensation must be made: *Bowlby* v. *Shively,* 22 Or. 410 (30 Pac. 154); *Lewis* v. *City of Portland,* 25 Or. 133, 160 (35 Pac. 256, 22 L. R. A. 736, 42 Am. St. Rep. 772, 46 Am. & Eng. Corp. Cas. 230); *Montgomery* v. *Shaver,* 40 Or. 244, 248 (66 Pac. 923).

The license granted was impliedly revoked by the legislative act authorizing the city to construct public docks (Sp. Laws 1903, p. 91), and the action of the city in selecting this site. The necessary implication arising from this last act is to authorize the city to use so much of the state's property as may be necessary to carry out the purposes of the statute: *Langdon* v. *New York,* 93 N. Y. 129, 151; *Williams* v. *Mayor etc. of New York,* 105 N. Y. 419 (11 N. E. 829); *In re*

*Water Front of City of New York,* 113 App. Div. 84 (98 N. Y. Supp. 1063, 1066); *Jeffrey* v. *Smith,* 63 Or. 514 (128 Pac. 822); 39 Am. & Eng. Ency. (2 ed.) 480.

3. Even if plaintiff were considered as having a vested riparian or wharf right, it would be subject to the implied reservation by the state and its agencies to use the place for public improvements in aid of navigation and commerce: *Lansing* v. *Smith,* 4 Wend. (N. Y.) 9 (21 Am. Dec. 89); *Furman* v. *Mayor of New York,* 10 N. Y. 567; *Sage* v. *New York City,* 154 N. Y. 61 (47 N. E. 1096, 38 L. R. A. 606, 61 Am. St. Rep. 592); *Lewis etc. Oyster Co.* v. *Briggs,* 198 N. Y. 287 (91 N. E. 846, 34 L. R. A. (N. S.) 1084, 19 Ann. Cas. 694); *Barney* v. *City of Keokuk,* 94 U. S. 324 (124 L. Ed. 224); *Scranton* v. *Wheeler,* 179 U. S. 141 (45 L. Ed. 126, 21 Sup. Ct. Rep. 48); *Union Bridge Co.* v. *United States,* 204 U. S. 364 (51 L. Ed. 523, 27 Sup. Ct. Rep. 367); *Ravenswood* v. *Flemings,* 22 W. Va. 52 (46 Am. Rep. 485); *West Chicago St. Ry. Co.* v. *People,* 201 U. S. 506 (50 L. Ed. 845, 26 Sup. Ct. Rep. 518); *Young* v. *Town of Morgan City,* 129 La. 339 (56 South. 303); *Lane* v. *Board of Harbor Commrs.,* 70 Conn. 685 (40 Atl. 1058).

For intervener, the State of Oregon, there was an oral argument by *Mr. Andrew M. Crawford,* Attorney General, with a brief over the names of *Mr. Crawford* and *Mr. William C. Benbow,* to this effect:

A. In Oregon the upland owner has no right, title or interest in the land under water beyond ordinary high-water mark: *Hinman* v. *Warren,* 6 Or. 408; *Parker* v. *Taylor,* 7 Or. 435; *Parker* v. *Rogers,* 8 Or. 183; *Shively* v. *Parker,* 9 Or. 500; *McCann* v. *Oregon Ry. & Nav. Co.,* 13 Or. 455 (11 Pac. 236); *Bowlby* v. *Shively,* 22 Or. 410 (30 Pac. 154); *Hume* v. *Rogue River Pack. Co.,* 51 Or. 237, 246 (83 Pac. 391, 92 Pac.

1065, 96 Pac. 865, 131 Am. St. Rep. 732) ; *Oregon* v.
*Portland Gen. Elec. Co.,* 52 Or. 502, 519 (95 Pac. 722,
98 Pac. 160).

B.   If the upland owner has any riparian rights be-
yond ordinary high-water mark in the public naviga-
ble waters of this state, such rights are subject at all
times to the power of the state to improve navigation
by the construction of public docks : *Bowlby* v. *Shively,*
22 Or. 410 (30 Pac. 154) ; *Lewis* v. *City of Portland,*
25 Or. 133 (35 Pac. 256, 42 Am. St. Rep. 772, 22 L. R.
A. 736) ; *Hume* v. *Rogue River Pack. Co.,* 51 Or. 237
(83 Pac. 391, 92 Pac. 1065, 96 Pac. 865, 131 Am. St.
Rep. 732) ; *Taylor Sands Fishing Co.* v. *State Land
Board,* 56 Or. 157 (108 Pac. 126) ; *Case* v. *Loftus,* 43
Fed. 839 (5 L. R. A. 684) ; *Miller* v. *Mendenhall,* 43
Minn. 95 (44 N. W. 1141, 8 L. R. A. 89, 19 Am. St.
Rep. 219) ; *Lenoir County* v. *Crabtree,* 158 N. C. 357,
(74 S. E. 105, 39 L. R. A. (N. S.) 1213) ; *Eisenbach* v.
*Hatfield,* 2 Wash. 236 (26 Pac. 539, 12 L. R. A. 632) ;
*Sage* v. *New York City,* 154 N. Y. 61 (47 N. E. 1096,
38 L. R. A. 606, 61 Am. St. Rep. 592) ; *Shively* v.
*Bowlby,* 152 U. S. 1 (38 L. Ed. 331, 14 Sup. Ct. Rep.
548) ; *Scranton* v. *Wheeler,* 179 U. S. 141–189 (45 L.
Ed. 126, 21 Sup. Ct. Rep. 48) ; *St. Anthony Water
Power Co.* v. *Water Committee,* 168 U. S. 349, 372,
(42 L. Ed. 497, 18 Sup. Ct. Rep. 157) ; *Weems Steam-
boat Co.* v. *People's Co.,* 214 U. S. 345, 355 (53 L. Ed.
1024, 29 Sup. Ct. Rep. 661) ; *McGilvra* v. *Ross,* 215 U.
S. 70, 80 (54 L. Ed. 95, 30 Sup. Ct. Rep. 27) ; *Home for
Aged Women* v. *Commonwealth,* 202 Mass. 422 (89 N.
E. 124).

C.   The state has no power to grant away into pri-
vate ownership its right to construct public docks
upon the land beyond ordinary high-water mark in
the navigable waters of the state : *State ex rel.* v.
*Gerbing,* 56 Fla. 603 (47 South. 353, 22 L. R. A.

(N. S.) 337–340); *Oelsner* v. *Nassau Light & P. Co.,* 134 App. Div. 281 (118 N. Y. Supp. 960); *Slingerland* v. *International Const. Co.,* 169 N. Y. 60 (61 N. E. 995, 56 L. R. A. 494); *Illinois Cent. R. Co.* v. *Illinois,* 146 U. S. 387–460 (36 L. Ed. 1018, 13 Sup. Ct. Rep. 110); *Louisiana Nav. Co.* v. *Oyster Commission,* 125 La. 740 (51 South. 706, 711); *Cohn* v. *Wausau Boom Co.,* 47 Wis. 314 (2 N. W. 546).

D.   The state may revoke any license or privilege granted to riparian owners to build docks upon land under water beyond ordinary high-water mark, and in this instance such revocation was effected by the Charter of Portland, section 73, subdivision 78, by Article IV, Section 1–a, of the Constitution and by the dock amendment to the Charter of Portland.

For respondent there was an oral argument by *Mr. McCharles William Fulton,* with a brief over the name of *Fulton & Bowerman* to this effect:

### *Immateriality of Location of High-water Mark.*

I.   The true location of the ordinary high-water line and the constitutionality of the statutes of 1874 and 1876 are immaterial here, and plaintiff is entitled to the injunction regardless of how they may be decided, for it is admitted that the elevator company is now the owner of such riparian rights as existed in the upland owners at the time this suit was commenced.   The wharfing right originally attached to the upland may be severed from the dry land, may be granted to another, and may be by the grantee exercised and enjoyed separately from the upland: *Parker* v. *West Coast P. Co.,* 17 Or. 510 (21 Pac. 822, 5 L. R. A. 61); *Montgomery* .v. *Shaver,* 40 Or. 244 (66 Pac. 923); *McCann* v. *Oregon Ry. & Nav. Co.,* 13 Or. 455 (11 Pac. 236); *Welch* v. *Oregon Ry. & Nav. Co.,* 34 Or. 447 (56 Pac. 417).

*As to the Contention That the Wharf Act has been Repealed by Implication.*

II.   The rule is that statutes not expressly repealing others are to be so construed as to enforce both, if possible: *Palmer* v. *State*, 2 Or. 66; *State* v. *Benjamin*, 2 Or. 126; *In re Booth's Will*, 40 Or. 154 (61 Pac. 1135, 66 Pac. 710).   Moreover, the charter provisions relied upon by the city are not at all repugnant to the wharf act of 1862: See, also, *State ex rel.* v. *Banfield*, 43 Or. 287 (72 Pac. 1093, 99 Am. St. Rep. 754, 65 L. R. A. 790); *Ex parte Howe*, 26 Or. 181 (37 Pac. 536, 25 L. R. A. 663); *State* v. *Phenline*, 16 Or. 107 (17 Pac. 572); *State* v. *Portland Gen. Elec. Co.*, 52 Or. 502 (95 Pac. 722, 98 Pac. 160); *State* v. *Linn County*, 25 Or. 503 (36 Pac. 297).

*Meaning of Title of Tide Land Act.*

III.   Further, the descriptive phrase "seashore and coast," used in the title of the act of 1872, is broad enough to include tide lands on all waters affected by the tides.   Such construction does no violence whatever to the language used; rather, it is entirely in harmony with the sense in which the word "coast" is frequently used: *North River S. Co.* v. *Livingston*, 3 Cow. (N. Y.) 713, 747; *The Victory*, 63 Fed. 631, 636, 68 Fed. 395, 397 (15 C. C. A. 490); *The Brittannia*, 153 U. S. 130 (38 L. Ed. 660, 14 Sup. Ct. Rep. 795); *The John King*, 49 Fed. 469 (1 C. C. A. 319).

*Long Acquiescence Forbids a Present Question of the Constitutionality of These Acts.*

IV.   Even though a statute would otherwise be adjudged invalid, if it has long stood unchallenged and has been followed by public officers, and if, relying on its supposed validity, private citizens have invested large sums of money (here more than $30,000,000 in the City of Portland alone), the courts will de-

cline to inquire into the constitutionality of the act: *United States* v. *Realty Co.,* 163 U. S. 427 (41 L. Ed. 215, 16 Sup. Ct. Rep. 1120); *Continental Imp. Co.* v. *Phelps,* 47 Mich. 299 (11 N. W. 167); *Scanlon* v. *Childs,* 33 Wis. 663; *Stuart* v. *Land,* 1 Cranch (U. S.), 299 (2 L. Ed. 115); *Johnson* v. *Joliet & Chicago R. Co.,* 23 Ill. 202; *Rogers* v. *Goodwin,* 2 Mass. 475; *McKeen* v. *De Lancy's Lessee,* 5 Cranch (U. S.), 22 (3 L. Ed. 25); *Houston & T. C. R. Co.* v. *State* (Tex. Civ.), 62 S. W. 114; *Pennoyer* v. *McConnaughby,* 140 U. S. 1 (35 L. Ed. 363, 11 Sup. Ct. Rep. 699); *Clark's Run S. R. P. Co.* v. *Commonwealth,* 96 Ky. 525 (129 S. W. 360); *United States* v. *Pugh,* 99 U. S. 269 (25 L. Ed. 322); *Collins* v. *Henderson,* 11 Bush (Ky.), 74; *United States* v. *Missouri, K. & T. R. Co.,* 37 Fed. 68; *Johnson* v. *Dexter,* 38 Mich. 695; *Auditor* v. *Cain,* 22 Ky. Law Rep. 1888 (61 S. W. 1016); *Dean* v. *Borchsenius,* 30 Wis. 236; *Packard* v. *Richardson,* 17 Mass. 123 (9 Am. Dec. 123); *Hewett* v. *Schultz,* 7 N. D. 601 (76 N. W. 230); *United States* v. *Union Pac. R. Co.,* 37 Fed. 551.

There was also an oral argument by *Mr. James Bremer Kerr,* as *Amicus Curiae,* with a brief over the name of *Carey & Kerr* to this effect:

## I.

*As to the Title to Land Between High and Low Water Mark on the Willamette River.*

A.   The title of the original act (Laws 1872, pp. 129–133) is broad enough to cover the provisions of the amendatory acts, and therefore the subsequent acts are not violative of Const. Or., Art. IV, § 20.

The terms used have all been judicially construed. "Shore of the Sea": *United Land Assn.* v. *Knight,* 85 Cal. 448, 482 (23 Pac. 267, 24 Pac. 818); "Sea":

*Waring* v. *Clarke,* 5 How. (U. S.) 441, 447 (12 L. Ed. 226); "Tide Waters": *Commonwealth* v. *Vincent,* 108 Mass. 441; *Attorney General* v. *Woods,* 108 Mass. 436 (11 Am. Rep. 380); "Coast": *Ravesies* v. *United States,* 35 Fed. 917; "Sale": *Marts* v. *Cumberland Mut. F. Ins. Co.,* 44 N. J. L. 478.

B.   The titles of the amendatory acts are clearly sufficient to support the provisions in question: *The Geo. W. Elder,* 159 Fed. 1005; *Leake* v. *Colgan,* 125 Cal. 413 (58 Pac. 69); *Fort Street U. D. Co.* v. *Commissioners of Railroads,* 118 Mich. 340 (76 N. W. 631, 53 L. R. A. 274); *People* v. *Whitlock,* 92 N. Y. 191.

C.   The provisions of the amendments do not fall within the object or purpose intended by the constitutional restriction: *Lake County* v. *Rollins,* 130 U. S. 662 (32 L. Ed. 1060, 9 Sup. Ct. Rep. 651); *Jarrolt* v. *Moberly,* 103 U. S. 580 (26 L. Ed. 492); *Prigg* v. *Pennsylvania,* 16 Pet. (U. S.) 539 (10 L. Ed. 1060); *State* v. *Shaw,* 22 Or. 287 (29 Pac. 1028); *Clemmensen* v. *Peterson,* 35 Or. 47 (56 Pac. 1015); *Pioneer Irr. Dist.* v. *Bradley,* 8 Idaho, 310 (68 Pac. 295).

D.   As to the effect of contemporaneous construction of statutes by those who are called upon to act under them: *Edwards* v. *Darby,* 12 Wheat. (U. S.) 207 (25 L. Ed. 604); *United States* v. *Union Pac. Ry. Co.,* 37 Fed. 551; *Bate Refrig. Co.* v. *Sulzberger,* 157 U. S. 1 (39 L. Ed. 601, 15 Sup. Ct. Rep. 508); *United States* v. *Hammers,* 221 U. S. 220 (55 L. Ed. 710, 31 Sup. Ct. Rep. 593).

E.   As to legislative construction of statutes and the effect thereof: *United States* v. *Freeman,* 3 How. (U. S.) 556 (11 L. Ed. 724).

F.   This statute has become a rule of property: *Continental Imp. Co.* v. *Phelps,* 47 Mich. 299 (11 N. W. 167); *Fitzwilliam* v. *Campbell,* 99 Fed. 30 (39 C. C. A. 399).

G. The previous determination by this court that the statutes in question are valid creates a right in the land owner purchasing on the faith of such determination which is protected by the Constitution of the United States, Article I, Section 10: *Muhlker* v. *New York & H. R. R. Co.,* 197 U. S. 544 (49 L. Ed. 872, 25 Sup. Ct. Rep. 522); *Lewis* v. *City of Portland,* 25 Or. 133 (35 Pac. 256, 22 L. R. A. 736, 42 Am. St. Rep. 772); Lewis' Sutherland, Stat. Const. (2 ed.), §§ 481, 485.

## II.

*Wharfage Rights of Owners of Land upon Navigable Streams.*

1. Lord's Oregon Laws, Sections 5201, 5202 (Act of October 17, 1862) are not repealed by later legislation.

(a) Repeals by implication not favored and will not be held to exist if there is any other reasonable construction: *United States* v. *Greathouse,* 166 U. S. 601, 605 (41 L. Ed. 1130, 17 Sup. Ct. Rep. 701); *Palmer* v. *State,* 2 Or. 66; *State* v. *Benjamin,* 2 Or. 125; *In re Booth's Will,* 40 Or. 154, 156 (61 Pac. 1135, 66 Pac. 710); Lewis' Sutherland, Stat. Const. (2 ed.), § 267.

(b) Statute relating to one subject not repealed by later statute relating to another subject: *United States* v. *Gillis,* 95 U. S. 407, 416 (24 L. Ed. 503); *The J. D. Peters,* 78 Fed. 368, 373; *United States* v. *Mexican Nat. R.,* 40 Fed. 769, 772; *United States* v. *Claflin,* 97 U. S. 546 (24 L. Ed. 1082); Lewis' Sutherland, Stat. Const. (2 ed.), pp. 468, 469.

2. Repeal of a statute does not affect vested rights under it: *Society etc.* v. *New Haven,* 8 Wheat. (U. S.) 494 (5 L. Ed. 670).

It may with reason be contended that the right to construct wharves had vested in the owners of land on

streams, rights which cannot be destroyed even by
direct legislation: Cooley, Const. Law (2 ed.), 332;
*Pearsall* v. *Great Northern R. Co.,* 161 U. S. 646, 675
(40 L. Ed. 838, 16 Sup. Ct. Rep. 705); *Fletcher* v.
*Peck,* 6 Cranch (U. S.), 87, 137 (3 L. Ed. 162); *Parker*
v. *West. Coast Pkg. Co.,* 17 Or. 510, 515 (21 Pac. 822,
5 L. R. A. 61); *Montgomery* v. *Shaver,* 40 Or. 244, 250
(66 Pac. 923); *Parker* v. *Taylor,* 7 Or. 435; *McCann*
v. *Oregon Ry. etc. Co.,* 13 Or. 455 (11 Pac. 236); *Welch*
v. *Oregon Ry. & N. Co,* 34 Or. 447 (56 Pac. 417).

As *Amicus Curiae* there was also a brief over the
name of *Mr. Martin L. Pipes* to this effect:

I present three propositions on behalf of the people
of the State of Oregon.

1. The act of the legislature now known as Sections
5201 and 5202, L. O. L., is not the grant of any fran-
chise to build a wharf, but is an authority to exercise
such a franchise, which must be acted upon in order to
constitute in the beneficiary of the act any property
right or interest.

More than fifty years have elapsed since the act was
passed, and nearly forty years ago the place in ques-
tion came within the city limits of Portland, and the
predecessors of the present owner could have availed
themselves of the opportunity to improve the facilities
for commerce. The terms of the act itself show that
it was not intended to create merely a private right
of wharfage for the benefit solely of the land owner,
but that it was a privilege to be used for the benefit
of the public under the control of the state and its
agencies. It was plainly the purpose of this act to
provide for public wharfage. The power of regula-
tion given and the duty imposed upon the municipality
to regulate the wharf or wharves, fix the character of
the authority and constitute the offer, when accepted,

a public franchise.  The intention was to delegate to adjacent upland owners the right to exercise a public franchise, which, unless so delegated, could and would have been exercised by the state or by the municipality under its authority.  It would therefore follow that whether the act offering the license was repealed or not, or the right therein conferred revoked or not, the plaintiff cannot avail itself of the act, unless, before the state resumed its powers, it had accepted the license and built the wharf.  Authorities in point are 40 Cyc. 895, subds. 2, 896 and 901.

2. If it be supposed that the act was a grant or a continuing offer that would have to be withdrawn, still it is now ineffective, because it has been forfeited by nonuser for more than twenty years.  19 Cyc. 1462, and *New Jersey* v. *Wright,* 117 U. S. 648 (29 L. Ed. 1021, 6 Sup. Ct. Rep. 907), are illustrative of the principle invoked.  Contemplate the result if this is not so.  All the upland owners adjacent to navigable water may refuse to build wharves, and thus the state would be tied fast, and could not promote commerce or navigation. It would be left entirely to the will and interest of the land owners to exercise or neglect this important public function, and the state could not provide for public docks without buying under its right of eminent domain the right which I earnestly insist it now possesses.

3. Until acted upon by building a wharf, it is not necessary to revoke the authority conferred or repeal the act; it is sufficient for the state or its instrumentalities to assume control of the wharf right for public purposes.  Argument has been pressed that the act constituting the dock commission and creating in Portland a right to build public docks is not in conflict with Sections 5201 and 5202, L. O. L., and that therefore the authority to the upland owner to con-

struct wharves has not been revoked. However, that may be, nevertheless, as to this plaintiff, and under the present circumstances, the revocation has been accomplished by the authority given the dock commission to build public wharves. This is so because neither the City of Portland nor the dock commission invades any possession or right of possession, or any property, of the plaintiff, since it had not taken any steps to effectuate its right. The case would be different if the plaintiff were in the position of the plaintiffs in the Lewis case—there expensive wharves had been built out from high-water mark to the channel. The court properly held that in the absence of legislation withdrawing the right to build wharves, the plaintiffs in that case had property interests for which compensation must be made.

It seems to be contended that the City of Portland has no powers in this matter, and a distinction is sought to be drawn between the right of the state and the right of the city, or the ownership of the state and the ownership of the city, in the *locus in quo.* A word on that subject. The state government exercises its powers through subordinate governmental agencies. Among these subordinate agencies are municipal corporations. Prior to the recent amendment the powers of the municipalities were fixed, determined and delegated by the state legislature; by the amendment, however, the people have delegated to the municipal corporations directly the general powers in respect of municipal matters, and authorized the people of the municipality to define, create and limit such powers. The right of the people to amend their charters and confer upon their municipal governments the necessary powers is derived directly from the people of the state by their Constitution. Their source of power is the same as

the source of the power of the legislature, and in fact all of the governmental departments. Within its limits, and subject to the limitations fixed by the constitutional amendment itself, the people of the city, in amending its charter, exercise all of the powers formerly exercised by the legislature. This, of course, is limited by the limitation that the power so exercised must not be in conflict with the Constitution and criminal laws of the state and by the decision in *Straw* v. *Harris*, 54 Or. 424 (103 Pac. 777, 135 Am. St. Rep. 832), it must be subject to the control by the legislature exercised by general enactment. The charter, therefore, of the City of Portland, and the proceedings of the dock commission and their municipal officers and agencies, constitute the will and power of the State of Oregon within the limits and for the purposes designated. The people of the municipality, under their new power, are as much a department for governmental powers of the state as the state legislature is in respect of statewide matters. The building of public wharves in a municipality for public use, although these are to be used for the benefit of all the people of the state, comes within the purview of municipal legislation and regulation, not because such wharves are for the benefit of the public of the municipality, but because, within the municipal limits, the city is deemed to be the best and most convenient instrument for the control and regulation of such instrumentalities. In *Kiernan* v. *Portland*, 57 Or. 454 (111 Pac. 379, and 112 Pac. 402) the court held, under paragraph 12 of the head-notes, that the City of Portland did not need the consent of the State of Oregon to build the Burnside bridge within its own limits.

As *Amicus Curiae, Mr. Ephriam B. Seabrook* presented an oral argument in support of the conten-

tions of the plaintiff, and filed a brief over the name of *Malarkey, Seabrook & Dibble* to this effect:

Owing to the public nature of the questions involved and the great financial interest of our client, the Eastern & Western Lumber Co., which claims a large body of waterfront property near the site in question, we venture to add a few words to the able arguments already presented for respondents.

### *The Acts of 1874 and 1876 are Valid Grants.*

A.   By these acts the upland owners were granted all the overflowed lands on the banks of the Willamette River—these were not tide lands, but overflowed land to which the state had title.  The argument is that grants are not "sales," nor are the lands so disposed of situated on the "seashore" or "coast," and therefore the subjects are not embraced within the title, as required by Const. Or., Art. IV, § 20.  The sole subject matter of the act of 1872 and the amendments of 1874 and 1876 is the disposal of the state's lands on the seashore and coast, and any matter germane to or connected with that subject may be embodied in the act.  It is true that the title does not use the word "disposal" and does use the word "sale," yet it is a matter of common sense that to provide for the sale of a large quantity of land necessarily includes the gift or grant of small portions thereof in aid of the sales.  If, under a title providing for the sale of certain land, an act was passed granting all of the same lands, such act would not be valid.  But a title providing for the sale of lands is broad enough to sustain the grant or gift of some of them.  The subject matter is clearly the disposal of the lands, and just how they were to be disposed of is provided for in the body of the act: *State* v. *Shaw,*

22 Or. 287 (29 Pac. 1028); *State* v. *Illinois etc. R. Co.,* 33 Fed. 730; *Oregon* v. *Portland Gen. Elec. Co.,* 52 Or. 502–529 (95 Pac. 722, 98 Pac. 160).

We contend that where the subject matter is the sale and disposal of the state's tide lands, the matter of determining that some of the lands, which might be claimed by purchasers to be tide-lands, are not such, and, by the policy of the state adopted for the disposal of its lands, are conceded by the state to belong to the upland owner, is certainly germane to and connected with that subject. The Willamette River during five months of the year is affected by the tides, and is an arm or inlet of the sea having direct communication therewith. The shore lands on the banks are generally narrow and of small extent. The uniform policy of the state has always been that these lands should not be sold, but should be the property of the upland owner. So when provision was made for the sale of the state's tide and overflowed lands, these and similar lands on the Coquille and Coos Rivers were excepted and expressly confined to the upland owners. It cannot be said these matters are foreign or incongruous with the providing for the sale of overflowed lands.

It is further urged that the shores of the Willamette River are neither "seashore" nor "coast." This is true as to parts of that stream, but not so as to the portion lying within the limits of the City of Portland. In order to sustain these acts the court will adopt that meaning of the words used in the title which will support the act, though the most common meaning may be more restricted. See the word "port" in *Straw* v. *Harris,* 54 Or. 424, 428 (103 Pac. 777, 135 Am. St. Rep. 832); the word "seashore" in *United Land Assn.* v. *Knight,* 85 Cal. 448, 482 (23 Pac. 267, 270, 24 Pac. 818), and *Common-*

*wealth* v. *Alger,* 61 Mass. (7 Cush.) 53. It is shown in respondent's brief that the word "coast" is not confined to the ocean beach. We therefore contend that the larger and more general meaning that will make the title of the act broad enough to sustain these grants should be given to the words "seashore and coast."

B.   There is, however, another reason why these acts should be upheld as valid grants as against the City of Portland. The city is here claiming a right and advantage from and through the identical grants contained in these very acts, and therefore cannot be heard to question the validity thereof. The city claims that because of its ownership of North Front Street, it has the wharf rights east thereof. In paragraph 4 of the answer (page 10 Abs. Record), the city alleges that North Front Street is entirely below ordinary high-water mark. In the appellants' brief, pages 40 to 43, the claim is made that because of the location of North Front Street across these shore lands the city is entitled to all rights between the street and the channel.

As owner of North Front Street the city is the grantee of and claims under the upland owner who platted his upland together with the shore land and dedicated North Front Street across the same. So the source of the city's title to North Front Street and the upland owner's title to the balance of the shore land is the same. The upland owner's title to the shore land is derived from the state by virtue of these acts. The upland owner by the dedication of North Front Street has conveyed to the city a designated part of said shore land constituting North Front Street. The city, in this suit, is claiming some benefit and advantage because of such ownership so derived. The result from this situation is that the

city cannot claim title to a part of this land through the upland owner's title, and at the same time be heard to say that the grants to the upland owner by the state are void: *Oregon* v. *Portland Gen. Elec. Co.,* 52 Or. 502, 530 (95 Pac. 722, 98 Pac. 160); *Daniels* v. *Tearney,* 102 U. S. 415 (26 L. Ed. 187); *Vickery* v. *Blair,* 134 Ind. 554 (32 N. E. 880); *Davis* v. *Wakelee,* 156 U. S. 680 (39 L. Ed. 578, 15 Sup. Ct. Rep. 555); *Willis* v. *Board,* 86 Fed. 872 (30 C. C. A. 445); *Arthur* v. *Israel,* 15 Colo. 147 (25 Pac. 81, 10 L. R. A. 693, 22 Am. St. Rep. 381); *Folger* v. *Clark,* 80 Me. 237 (14 Atl. 9, 6 Am. St. Rep. 178); *Smith* v. *Seattle,* 41 Wash. 60 (82 Pac. 1098); *Chicago etc. Ry. Co.* v. *Zernecke,* 183 U. S. 582 (46 L. Ed. 339, 22 Sup. Ct. Rep. 229).

It is well-settled law that the grantee in a conveyance, who claims under it, is estopped to deny the validity of the grantor's title: *Marsh* v. *Thompson,* 102 Ind. 272 (1 N. E. 630); *Woolfolk* v. *Ashby,* 59 Ky. (2 Met.) 288; *Muller* v. *Hoth,* 110 La. 105 (34 South. 162); *Granger* v. *Sallier,* 110 La. 250 (34 South. 431); *Multnomah County* v. *White,* 48 Or. 183 (81 Pac. 388, 85 Pac. 78); *Harkrader* v. *Carroll,* 76 Fed. 474 (18 Morr. Min. Rep. 474).

MR. JUSTICE BEAN delivered the opinion of the court.

The claims of the respective parties may be summarized as follows: Plaintiff claims:

(1) Title in fee by patent from the government and subsequent conveyances as to the westerly 100 feet, which plaintiff claims has always been above the ordinary high-water line, or is now above such line by reason of accretion.

(2) Title in fee from the State of Oregon granted by acts of the legislature of 1874 and 1876, known

as the tide land acts, and subsequent conveyance to a strip about 100 feet wide east of and adjacent to the above, being between the ordinary high-water line and low-water line as claimed by plaintiff.

(3) Riparian or littoral rights and a wharf right to the portion between low water and the harbor line.

Defendants, in answer to the first claim, maintained that the *locus in quo* belongs to the State of Oregon because it is entirely below the ordinary high-water line, which is westerly of North Front Street, although the apparent line is now near the easterly line of such street. Plaintiff's second claim is based on the tide land act as amended in 1874 and 1876, whereby the state purports to grant to the adjacent upland owners "any tide or overflowed lands upon said Willamette River." In answer to this claim defendants maintain: (1) That the *locus in quo* is river shore and not "tide or overflowed lands" within the meaning of this act, and (2) that, in any event, this portion of the act is void because not embraced in its title. In answer to plaintiff's third claim defendants maintain: (1) That the state's ownership of the bed and shores of a navigable river is absolute, admitting of no easement on the part of the adjacent upland owner; (2) that the wharf act creates only a permit or license to the upland owner to wharf out, but plaintiff, not having constructed a wharf, has acquired no vested right, and his license or permit has been revoked by the act of the city in selecting the *locus in quo* and proceeding to construct a public dock under legislative authority; and (3) that, in any event, littoral or wharf rights are subject to right of the state and its agencies to construct docks and other improvements in aid of navigation and commerce.

It is only fair to say that the learned counsel on both sides, as well as those appearing *amici curiae*

in their several briefs, have shed much light upon the question involved and have stated their positions with clearness.   As a basis for a proper understanding, it may be well to observe that, by the common law of England, the title and dominion of the sea and of rivers and arms of the sea where the tide ebbs and flows, and of all the lands below high-water mark, within the jurisdiction of the crown of England, are in the king.   These waters and the land which they cover are not capable of ordinary occupation, cultivation, and improvement, and their primary uses are public in their nature, for highways of navigation and commerce, and for fishing purposes by all the king's subjects.   Therefore the title *jus privatum* in such lands, as of waste and unoccupied lands, belongs to the king as the sovereign; and the dominion *jus publicum* is vested in him as the representative of the nation and for the public good.   The English possessions in America were held by the king, and the exclusive power to grant them was vested in him in like manner.   The English monarchs granted charters for large tracts of land on the Atlantic coast, giving the grantees both the territory described and the powers of government, including the property and dominion of lands under tide waters.   With the surrender of the British, all the rights of the crown and of parliament became vested in the several states, subject to the rights relinquished to the national government by the Constitution of the United States.   In this manner the government of the colonies and the original states became vested with the title to lands under navigable waters.   The states admitted to the Union since the adoption of the Constitution have the same rights as the original states had in the tide waters and lands below the high-water mark within their respective jurisdictions.

In this country the same principle applies to the Great Lakes, and in some states it has been extended to navigable rivers. In the early government of the colonies and later of the states, in order to induce persons to erect wharves for the benefit of navigation and commerce, the owners of land bounding on tide waters were allowed greater rights and privileges in the shore below high-water mark than in England. The nature and degree of the rights and privileges differed in the various states; in some they were regulated by statute and in others by usage only. Each state, according to its own views of policy and justice, has dealt with the lands under the water as it has deemed best for the public interests, reserving its own control over such lands or granting within its limits rights therein to individuals or corporations, whether owners of the adjoining upland or not. Therefore the title and rights of riparian owners in the soil below high-water mark are governed by the local laws of the several states, subject to the rights granted by the federal Constitution to the United States for regulating and improving navigation. The holdings have not been uniform in regard to the right of a riparian owner to establish a wharf on his own land extending over the shore between high and low water marks and lands under the water for the purpose of reaching a navigable point. In some states it is held, sometimes because of long usage, sometimes by statute, and sometimes upon the interpretation of the common law adopted by the courts, that, for the purpose of making available the right of a riparian owner to access to navigable waters, he may make a landing, dock, wharf, or pier, for his own use or that of the public, for the purpose of reaching the ordinary point of navigation, subject to whatever rules the legislature may enact for the protec-

tion of the public, and also subject to the right of the United States to exercise its powers for regulating and improving navigation. The right of a riparian owner to construct a wharf or landing is founded largely upon equitable considerations. Where a wharf has been constructed by a riparian owner, in opposition to no statute, and without the interference of the state and without detriment to superior public rights, and large and valuable interests have been created, the owner has generally been held to have been justified in constructing such wharf: 1 Dillon, Mun. Corp. (5 ed.), § 264.

The paramount right of navigation which is vested in the state and also in the general government of the United States by virtue of the authority conferred upon it to regulate commerce between the states and with foreign nations is receiving constant elucidation by the courts, but no fixed rule can yet be laid down defining the extent to which the federal government or the state may interfere with the property of riparian and other owners without becoming liable for compensation: Dillon, Mun. Corp. (5 ed.), § 265.

1. Let us then consider what policy has been adopted by the State of Oregon and what has been done in confirmation thereof. In 1862 the legislative assembly, evidently deeming it for the best interests of the state to encourage private parties to construct docks, wharves, etc., for the convenience of and in aid of navigation, without the state, either directly or through its municipalities engaging in such enterprises, passed what is known as the wharf act (Sections 5201, 5202, L. O. L.). The first section provides that "the owner of any land in this state lying upon any navigable stream or other like water, and within the corporate limits of any incorporated town therein, is hereby authorized to construct a wharf or

wharves upon the same, and extend such wharf or wharves into such stream or other like water beyond low-water mark so far as may be necessary and convenient for the use and accommodation of any ships or other boats or vessels that may or can navigate such stream or other like water." The other section confers upon the corporate authorities of the town wherein such wharf is proposed to be constructed the power to regulate the exercise of the privilege or franchise granted and to prescribe the mode and extent to which the same may be exercised beyond the line of low water, so that the same will not unnecessarily interfere with navigation. The premises in controversy were included within the limits of the City of Portland in 1883. The grant of the privilege mentioned in Section 5201, L. O. L., is a continuing grant and speaks in the present tense as long as the statute continues in force; therefore the act, if it has not been revoked, applies to the land in question.

When a statute is expressed in general terms and in words of the present tense, it will, as a general rule, be construed to apply not only to things and conditions existing at the time of its passage, but will also be given a prospective interpretation by which it will apply to such as come into existence thereafter: 36 Cyc. 1235.

2. In 1872 the legislature passed an act entitled "An act to provide for the sale of tide and overflowed lands on the sea shore and coast": Laws 1872, p. 129. This act gave the owners of land fronting upon such tide land the preference right to purchase the tide land belonging to the state in front of the land so owned. By an act approved October 26, 1874 (Laws 1874, p. 76), the following amendment was incorporated into the tide land act, without changing the title, namely: "That the Willamette River shall

not be deemed a river in which the tide ebbs and flows within the meaning of this act, or of the act to which this act is amendatory; and the title of this state to any tide or overflowed lands upon said Willamette River is hereby granted and confirmed to the owners of the adjacent lands, or when any such tide or overflowed lands have been sold, then in that case, to the purchaser or purchasers of such tide or overflowed lands from such owner of such adjacent lands, or some previous owner thereof, as the case may be.'' This act was further amended in 1876 (see Laws 1876, p. 69) so as to include in its provisions the Coquille, Coos and Umpqua Rivers.

The validity of the acts is attacked on the ground that the subject matter of a grant of land on the Willamette River is not included in the title of the act of 1872, of which the acts in question are amendments: Laws 1872, p. 129. Therefore the amendments are repugnant to the requirements of Article IV, Section 20, of the Constitution of Oregon, providing that ''every act shall embrace but one subject, and matters properly connected therewith, which subject shall be expressed in the title.'' It is contended on behalf of plaintiff that the title of this act is broad enough to embrace tide and overflowed lands along rivers emptying into the ocean, and that this is established by decisions defining the meaning of the terms used. That ''the shore of the sea is that part of the land covered by water in its greatest ordinary flux, the ports, bays, roadsteads and gulfs, and the rivers, although they may not be navigable * * their beds, mouths, and the salt marshes'': *United Land Assn.* v. *Knight,* 85 Cal. 448, 482 (23 Pac. 267, 270). That the word ''sea'' has been held to mean ''not only high sea, but arms of the sea, waters flowing from it into ports and havens, and as high upon rivers as the tide

ebbs and flows": *Waring* v. *Clarke,* 5 How. (U. S.) 441, 462 (12 L. Ed. 226). That "tide waters" are waters, "whether salt or fresh, wherever the ebb and flow of the tide from the sea is felt": *Commonwealth* v. *Vincent,* 108 Mass. 441, 447; *Attorney General* v. *Woods,* 108 Mass. 436, 439 (11 Am. Rep. 380). That the word " 'coast' is defined to be the seaboard of a country": *Ravesies* v. *United States* (D. C.), 35 Fed. 917, 919. That that portion of the country which drains into the Pacific Ocean is frequently spoken of as the "Pacific Coast."

3. It is well settled that every presumption will be indulged in to hold a statute valid, and it is only where an act is purely repugnant to the Constitution that the courts will hold it void. This is especially true where the act in question has been enacted for many years and acted upon by the officers of the state and by the people as valid so that it has become a rule of property. Millions of dollars have been invested upon the strength of the validity of these laws, and the value of lands have been thereby enhanced; therefore the acts should not be overturned unless it is necessary to do so in order to avoid doing violence to the Constitution. Stability of land titles is an object of moment and worth to the people of the State of Oregon.

4. The subject matter of the act of 1872, and the amendments of 1874 and 1876, is the disposal of the state's land on the seashore and coast, and any matter germane to or connected with that subject may be embodied in the act. The title does not use the word "disposal" but uses the word "sale." In discussing the question of title to a legislative act, Mr. Justice BEAN, in *State* v. *Shaw,* 22 Or. 287, at page 289 (29 Pac. 1028, at page 1029), said:

" * * The departure (from the title) must be plain and manifest, and all doubts will be resolved in favor of the law. * * If all the provisions of the law relate directly or indirectly to the same subject, are naturally connected, and are not foreign to the subject expressed in the title, they will not be held unconstitutional. * * "

5. The word "sale" used in the act of 1872 does not definitely refer to the matter of granting or confirming title to tide and overflowed lands upon the Willamette and other rivers and disposing of the same without a money consideration: See 7 Words and Phrases, p. 6291.

6. We cannot say, however, that the matter is foreign to the subject expressed in the title.

7. Be that as it may, and passing to the amendatory act of 1876, the title of this act was the whole of the act of 1874, including the amendments granting and confirming tide and overflowed lands on the Willamette and other rivers, which was referred to in the title of the act of 1876. There could certainly be no mistake in regard to this act. Many authorities support the rule that the title of an amendatory act is sufficient and will uphold any legislation that would have been permissible under the original title, when the law amended or enacted after the amendatory act refers by chapter or by section to the act amended, giving its title. This practice, however, has been criticised: *Fort Street Union Depot Co.* v. *Commissioner of Railroads,* 118 Mich. 340 (76 N. W. 631). After the enactment of the amendment of 1874, had there been a "joker" in the act, the members of the legislature and the people of the state would have had two years in which to consider the same and retrace their steps in 1876. Instead of so doing, the lawmakers re-enacted the measure. From this, in connection with the fact that the courts and people

in general have sanctioned the grant as expressed by the legislature for more than 25 years, and have acted thereon, and that the state, county, and city have treated the land as plaintiff's or its grantors, we conclude that the statute is a valid one, and that the grant and confirmation are complete.

In *Lewis* v. *City of Portland,* 25 Or. 133 (35 Pac. 256, 22 L. R. A. 736, 42 Am. St. Rep. 772), this court practically settled the question as to the statutes applying to lands between' high and low water marks on the Willamette River. At page 162 of 25 Or. (page 262 of 35 Pac., 22 L. R. A. 736, 42 Am. St. Rep. 772), of the opinion Justice LORD said :

"This grant conveyed the title to all such lands along these rivers, whether tide or overflowed, to the riparian owners, subject to the public trust. As the Willamette is a fresh-water river and only slightly affected by the tides a short distance from its mouth, there is no tide land at Portland, as held in *Andrus* v. *Knott,* 12 Or. 501 (8 Pac. 763), and therefore it results that if the submerged or overflowed lands described in the act include such as are not affected by the tides, and lie between the upland and navigable water, they belong to such owners, subject to the paramount right of navigation and commerce": See *Coquille M. & M. Co.* v. *Johnson,* 52 Or. 547 (98 Pac. 132, 132 Am. St. Rep. 716).

The Charter of the City of Portland, Section 216, provides that all the wharves, waterfront, and harbor within the City of Portland shall be under the management and control of the executive board, subject to ordinance. And Subdivision 78 of Section 73 provides that the council shall have power and authority to provide for the construction and maintenance of wharves, docks, and levees and all such other work as may be required for the accommodation of commerce. The people of Portland, by the popular

vote in 1910, adopted an amendment to Section 118 of the charter whereby the Department ·of Public Docks was created with authority *inter alia* to exercise the powers above granted to the executive board and council. On August 29, 1912, this commission made a selection of a site for a public dock embracing the *locus in quo,* and it is contended on behalf of the city that the authorization of the municipality to construct public docks necessarily authorized it to use such portion of the state's property as might be reasonably necessary therefor. To this contention we are unwilling to accede. It is not contended that the charter of 1903 in terms repealed the wharf act of 1862.

8. The rule that repeals by implication are not favored and will not be held to exist if there is any other reasonable construction is well settled. To repeal a statute by implication there must be such a positive repugnancy between the provisions of the new and the old that they cannot stand together or be harmonized: Sutherland, Const. (2 ed.), 267; *Palmer* v. *State,* 2 Or. 66; *State* v. *Benjamin,* 2 Or. 125; *Booth's Will,* 40 Or. 154, 156 (61 Pac. 1135, 66 Pac. 710) ; *United States* v. *Greathouse,* 166 U. S. 601, 605 (41 L. Ed. 1130, 17 Sup. Ct. Rep. 701).

9. The authority of the city to provide for public landing places and to construct docks and wharves only authorizes such action where the rights of others will not be interfered with thereby. The existence of such rights in private individuals is recognized by the statutory authorization to acquire them by condemnation or otherwise. From the whole tenor of the different statutes it does not appear that the later act was intended to revoke the provisions of the old acts of 1862, 1874 and 1876. A charter of the city which authorized it to lay out, open and improve

streets would not be held to authorize the city to open such street through a block the title to which was vested in the State of Oregon. The city can construct docks and wharves on any property which it has previously acquired; therefore the provisions of the charter can be given effect without interfering with the rights conferred by the act granting and confirming title in the tide and overflowed lands to the riparian owners on the banks of the Willamette.

10. One statute is not repugnant to another unless they relate to the same subject and are enacted for the same purpose. When there is a difference in the whole purview of two statutes apparently relating to the same subject, the former is not repealed by the latter. Undoubtedly the two statutes under consideration relate to different subjects: See *United States* v. *Claflin*, 97 U. S. 546, 552 (24 L. Ed. 1082); *United States* v. *Gillis*, 95 U. S. 407, 416 (24 L. Ed. 503). The case of *City of San Pedro* v. *Southern Pac. R. Co.*, 101 Cal. 133 (35 Pac. 993), is a case in point. The State of California had granted the city the right to construct and maintain wharves, piers, etc., on any land bordering on any navigable bay within the corporate limits. The city claimed, as the defendants do in the case at bar, that the state had granted to it the right to construct and maintain wharves. It was held that the power and authority conferred did not convey to the city the state's land or clothe the city with the absolute right to construct a wharf at any point on its waterfront which it might select, irrespective of the rights of others, but granted the city the power to erect docks the same as a natural person.

11. In regard to the high-water mark the Circuit Court found as follows: "That the line of ordinary high water in the left bank of the Willamette River

at the present time and at the time of the commencement of this suit was and is located over and across the said river block in Watson's Addition and the said river block No. 2 in Doscher's Addition and easterly of the easterly line of said Front Street, which said Front Street was continued on its course through said Doscher's Addition at the time of the platting thereof.''

The line of ordinary high water is the line to which the water rises in the seasons of ordinary high water or the line at which the presence of water is continued for such length of time as to mark upon the soil and vegetation a distinct character: *Johnson* v. *Knott,* 13 Or. 308 (10 Pac. 418); *Sun Dial Ranch* v. *May Land Co.,* 61 Or. 205 (119 Pac. 758). This line should be ascertained by an examination of the bed and banks of the river, and by taking into consideration all the circumstances and all the natural objects connected therewith, and by ascertaining where the presence and action of water are so common and usual and so long continued in all ordinary years as to mark upon the soil of the bed a character distinct from that of the banks.

12. The learned judge who tried the case appears to have been acquainted with the *locus in quo* to a certain extent and, as we understand, examined the same. This would lend great weight to the findings. While we do not deem the question vitally material, from an examination of the evidence upon this point, we think that this finding was correct and manifestly should not be disturbed.

13. It is claimed by defendants that, even if plaintiff were considered as having a vested riparian right or wharf right, such right is subject to the implied reservation on the part of the state and its agencies to use the *locus in quo* for the purpose of construct-

ing public docks, wharves, and other improvements in aid of navigation and commerce.

To further notice the trend of the decisions in the different states we note the following in the case of *State ex rel.* v. *Gerbing,* 56 Fla. 603 (47 South. 353, 22 L. R. A. (N. S.) 337, at page 343): "The rights of the people of the state in the navigable waters and the lands thereunder, including the shores or space between ordinary high and low water marks in the state, are designed for the public welfare, and the state may regulate such rights and the uses of the waters and the lands thereunder for the benefit of the whole people of the state as circumstances may demand, subject to the right of navigation, the control of which was surrendered to the federal government by the Constitution. The shores of a navigable river are the spaces between high and low water marks, and the bed of a river includes the shores. Tide land is that daily covered and uncovered by water by the ordinary flux and reflux of normal tides": Citing 1 Farnham, Waters, 227; *Baer* v. *Moran Bros. Co.,* 153 U. S. 287 (38 L. Ed. 718, 14 Sup. Ct. Rep. 823); *Baird* v. *Campbell,* 67 App. Div. 104 (73 N. Y. Supp. 617). In the above case it was also held that for the purpose of aiding navigation or commerce, or of encouraging new industries and the development of natural or artificial resources, the state may grant reasonable and limited rights and privileges to individuals to erect docks, wharves and slips over shallow waters to reach navigable portions thereof, or to fill in shallow waters adjacent to navigable waters and erect structures thereon, for the purposes of commerce incidental to navigation on the waters; or the state may grant reasonable and limited privileges for planting and propagating oysters or shellfish on land covered by waters of navigable streams;

but such privileges should not unreasonably impair the rights of the whole people of the state in the use of the waters or the lands thereunder for the purposes implied by law; citing *State* v. *Black River Phosphate Co.,* 32 Fla. 82 (13 South. 640, 21 L. R. A. 189). It was further held in the case of *State ex rel.* v. *Gerbing,* 56 Fla. 603 (47 South. 353, 22 L. R. A. (N. S.) 337, 343), which is cited and relied on by the state in the case at bar, that the title to lands under navigable waters, including the shores or space between ordinary high and low water marks, is held by the state, by virtue of its sovereignty, in trust for the people of the state for navigation and other useful purposes afforded by the waters over such lands, and the trustees of the internal improvement fund of the state are not authorized to convey the title to the lands of this character.

In the case of *Illinois Cent. R. Co.* v. *Illinois,* 146 U. S. 387 (36 L. Ed. 1018, 13 Sup. Ct. Rep. 110), it was held that the trust with which these lands are held by the state is governmental and cannot be wholly alienated. For the purpose of enhancing and improving the rights and interests of the whole people, the state may, by appropriate means, grant to individuals the title to limited portions of the lands or give individuals limited privileges therein, but not so as to divert them from their proper uses or so as to relieve the state of the control and regulation of the uses afforded by the land and water. In that case the State of Illinois had granted to the railroad company right of way 200 feet wide from Cairo to Chicago over the lands and waters of the state, and by consent of the city the right of way was located along the margin of Lake Michigan and an embankment raised and so protected from the violence of storms on the lake as to make the way safe as a roadbed.

From waterfront lots owned by it adjacent to this levee, the company built docks, extending out to deep water of the lake. Afterward the legislature of that state passed a law granting to the company the bed of the lake along a mile and a half of the city waterfront and extending a mile out into and including most of the outer harbor. This law was repealed by a subsequent legislature. The Supreme Court of the United States held that the repeal was a valid exercise of legislative power for the reason that the law repealed undertook to invest the railroad company with rights inimical to navigation and commerce and assumed to grant lands subjacent to the navigable waters of the lake. The use and enjoyment of its embankment, which occupied part of the original margin of the lake and the water thereof and the maintenance of its docks by the company, were protected in that case, subject to the condition that they should not extend into the lake beyond the point of practical navigability.

By an act of the legislature the State of Florida, in aid of commerce, vests in the United States or citizens thereof, owning lands actually bounded by and extending to the low-water mark on navigable streams, bays, and harbors, title to the submerged lands in front of the abutting lands as far as to the edge of the channel for the purpose of filling up from the shore, bank or beach and of erecting structures thereon in aid of commerce, not obstructing the channel, but leaving the full space for the requirements of commerce: Fla. Gen. Stats. 1906, §§ 643, 644. In a note to *State ex rel.* v. *Gerbing,* 22 L. R. A. (N. S.) 337, it is said:

"There seems little doubt of the correctness of the general proposition that the title to tide lands is in the state and may pass therefrom by grant. Such, indeed, was the specific conclusion reached in the fol-

lowing cases: *Pollard* v. *Hagan,* 3 How. (U. S.) 212 (11 L. Ed. 565); *Mumford* v. *Wardwell,* 6 Wall. (U. S.) 423 (18 L. Ed. 756); *Hoboken* v. *Pennsylvania R. Co.,* 124 U. S. 656 (31 L. Ed. 543, 8 Sup. Ct. Rep. 643) * * ''—and a long list of other cases.

In *Jones* v. *Oemler,* 110 Ga. 202 (35 S. E. 375), it was said that there could be no question but that the state owned the beds of all rivers within its jurisdiction, and that it had an absolute control over such lands as it had over any other property it might own, with the same power to grant, sell, or lease it, or any portion thereof, to any of its citizens upon terms or conditions which its legislature might prescribe, to the same extent that it would have the right to dispose of its wild or other lands. This proposition, sometimes laid down in broad and unrestricted terms, must be understood with the qualifications that the right of a state to grant tide lands is subject to those provisions of the national Constitution giving Congress control of the waters upon which foreign and interstate navigation is conducted: *Martin* v. *Waddell,* 16 Pet. 367 (10 L. Ed. 997); *United States* v. *Mission Rock Co.,* 189 U. S. 391 (23 L. Ed. 606, 47 L. Ed. 865); *Richardson* v. *United States* (C. C.), 100 Fed. 714; *Mobile Transp. Co.* v. *Mobile,* 128 Ala. 335 (30 South. 645, 64 L. R. A. 333, 86 Am. St. Rep. 143); affirmed in 187 U. S. 479 (47 L. Ed. 266, 23 Sup. Ct. Rep. 170).

In *Weber* v. *Harbor Commrs.,* 18 Wall. (U. S.) 57, 65, (21 L. Ed. 798), it was held that, upon the admission of a state into the Union upon equal footing with original states, absolute property in and dominion and sovereignty over all soil under the tide waters within her limits passed to the state with the consequent right to dispose of the title to any part of the soil in such manner as she might deem proper, subject only to the paramount right of navigation of the

waters so far as such navigation might be required by the necessities of commerce with foreign nations or among the several states, the regulation of which was vested in the general government. In *Eisenbach* v. *Hatfield,* 2 Wash. 236, 244, (26 Pac. 539, 12 L. R. A. 632), it was said that there was no doubt whatever but that tide lands belonged to the state in actual propriety, and that the state had full power to dispose of the same, subject to no restrictions save those imposed upon the legislature by the Constitution of the state and by the Constitution of the United States. In a few earlier cases the courts attempted to impose a trust in favor of the public upon the state's title to tide lands, thereby, to some extent at least, restricting the right of the state to grant the same. Thus in *Ward* v. *Mulford,* 32 Cal. 365, it was held that, while tide lands belong to the state by virtue of her sovereignty, yet the state held the same for the benefit of the people, and theoretically, at least, could make no disposal of such lands prejudicial to the rights of the public to use them for the purposes of navigation and fishery. This conclusion was quoted with approval in *People* v. *Kerber,* 152 Cal. 731 (93 Pac. 878, 125 Am. St. Rep. 93).

It has been said that the true limit of this trust doctrine has been best set forth in the New York decisions. In *People* v. *New York & S. I. Ferry Co.,* 68 N. Y. 71, the court said:

"The title to lands under tide waters in this country, which before the Revolution was vested in the king, became, upon the separation of the colonies, vested in the states within which they were situated. The people of the state in their right of sovereignty succeeded to the royal title and through the legislature 'may exercise the same powers, which, previous to the Revolution, could have been exercised by the king alone, or by him in conjunction with parliament,

subject only to those restrictions which have been imposed by the constitution of the state and of the United States": Chancellor in *Lansing* v. *Smith,* 4 Wend. 9 (21 Am. Dec. 89). The public right in navigable waters was in no way affected or impaired by the change of title. The state, in place of the crown, holds the title as trustee of a public trust, but the legislature may, as the representative of the people, grant the soil, or confer an exclusive privilege in tide waters, or authorize a use inconsistent with the public right, subject to the paramount control of Congress. * * "

Coming back to our own state, in *Hume* v. *Rogue River P. Co.,* 51 Or. 237 (83 Pac. 391, 92 Pac. 1065, 96 Pac. 865, 31 L. R. A. (N. S.) 396, 131 Am. St. Rep. 732), it was held that the state, by its admission into the Union by virtue of its sovereignty, became vested with the title to all tide lands, subject, however, to the public right of navigation and the common rights of the citizens of the state to fish therein. In the early case of *Hinman* v. *Warren,* 6 Or. 408, 411, tide land on the Columbia River was involved and was described in a patent from the United States to John McClure and wife. The plaintiff claimed title to it by a chain of conveyances from the McClures, and the defendant by deed from the state. Mr. Justice McARTHUR said, in substance, that the tide lands which are covered and uncovered by the ebb and flow of the sea belong to the State of Oregon by virtue of its sovereignty, and, adopting the principle common in cases from *Pollard's Lessee* v. *Hagan,* 3 How. 212 (11 L. Ed. 565), *Barney* v. *Keokuk,* 94 U. S. 324 (24 L. Ed. 224), said: "As the state became the owner of the tide lands, it had the power, under the provisions of the act providing for the sale of such lands, * * to sell the same. It has, however, no authority to dispose of its tide lands in such a manner as may inter-

fere with the free and untrammeled navigation of its rivers, bays, inlets, and the like. The grantees of the state took the land subject to every easement growing out of the right of navigation inherent in the public.'' This was quoted and approved in the leading case of *Bowlby* v. *Shively*, 22 Or. 410 (30 Pac. 154); *Shively* v. *Bowlby*, 152 U. S. 1, 54 (38 L. Ed. 331, 14 Sup. Ct. Rep. 548). Mr. Justice LORD, at page 417 of 22 Or., at page 156 of 30 Pac., of the opinion said: "Some contention is made that the phrase which describes the ownership of the state as being 'by virtue of its sovereignty' indicates that the title held by the State to such lands is as trustee for the public, and not as absolute owner, capable of conveying private rights therein, subject only to the paramount right of navigation; but the use of this phrase in that case was not designed to convey that meaning, when considered with reference to the whole decision. The contention was that the title of the tide lands, before the admission of the state into the Union, was in the United States and subject to its disposal; and, as it had granted away by its patent the tide lands in question before the state was admitted, no rights of the state ever attached to them. The court refused to accede to this view, but adopting the reasoning of *Pollard's Lessee* v. *Hagan, supra,* held that the state, upon its admission into the Union, became the owner of the tide lands, not as a grantee of the United States, but by virtue of its sovereignty; that the state had the right to dispose of such tide lands, under the provisions of the statute referred to providing for their sale; and that its grantees took them subject only to the paramount right of navigation existing in favor of the public.'' In the same case it is declared that the prior adjudged cases in this state regarding the nature of the state's title to lands between high and

low water marks are the foundation of the doctrine that the state may sell and convey its tide lands, and that its grantees take them free from any right therein from the upland owner, and subject only to the paramount right of navigation inherent in the public.

Mr. Justice BOISE, in *Parker* v. *Taylor,* 7 Or. 435, at page 446, said: "As has been before stated, the patent from the United States conferred on the patentee no right to the tide lands lying between high and low water. These were the property of the state and absolutely at its disposal. Its deed gives to them the same fee-simple title as the patent from the United States gave to the land above high tide. * * Land situated as this is, covered with shoal water, may, under proper regulations by the state and municipal authorities, be reclaimed from the sea by filling in or by driving piles and building on them and becomes private property and the subject of sale the same as any other property." The view that the state is the absolute owner of the tide lands, subject only to the paramount right of navigation, is further illustrated in the case of *Parker* v. *Rogers,* 8 Or. 183. At page 189 of 8 Or. of the opinion Mr. Justice BOISE, speaking for the court, said: "We are aware that it is a general rule that what is appurtenant to land passes with it, being an incorporeal hereditament, but the right to build a wharf on the land of the state below high water is a franchise which attaches to the tide land, and it is appurtenant to it rather than to the adjacent land, for it can be severed from the adjacent land and enjoyed without it." In *Corvallis & Eastern R. Co.* v. *Benson,* 61 Or. 359 (121 Pac. 418), Mr. Justice BURNETT, speaking for the court, after an examination of many authorities, held that the title to the tide lands between high and low water marks acquired by the state consisted of two elements: *Jus*

*privatum,* or private right, and the *jus publicum,* or public right—the *jus privatum* being a species of private property which the state held the same as a private owner and might grant to anyone, in any manner, or for any purpose not forbidden by the Constitution, the grantee thereby taking the title as absolutely as under a private conveyance; but the *jus publicum,* being the dominion of sovereignty in the state, by which it prevents any use of lands bordering on navigable waters which would materially interfere with navigation and commerce thereon, cannot be abdicated or granted.

Much reliance is placed by the defendants in the opinion in the case of *Sage* v. *Mayor,* 154 N. Y. 61 (47 N. E. 1096, 38 L. R. A. 606, 61 Am. St. Rep. 592), wherein it was held that the absolute power to improve a waterfront for the benefit of navigation exists in the state or in its municipal grantee as a trustee for the public, free from any interference by riparian owner whose sole right as against such authority was the statutory right of pre-emption in case of a sale, the riparian owner never having exercised such right of pre-emption, and having no title or interest in the land under water in front of his premises. In *Lewis* v. *City of Portland,* 25 Or. 133, 167 (35 Pac. 256, 263, 22 L. R. A. 736, 42 Am. St. Rep. 772), in discussing the wharfage act, it was said: ''It is doubtless true that, if the statute should be repealed or the adjacent tide lands disposed of, the privilege given the upland owner to build a wharf across the tide lands to deep water, unless acted upon or availed of would be revoked.'' In the case at bar the adjacent overflowed land has been conveyed by the state to the upland owner. However, an upland owner of land bordering on a navigable stream owns only to the high-water line and the stream and the river and its banks and bed

belong to the state: *State* v. *Portland Gen. Elec. Co.,* 52 Or. 502 (95 Pac. 722, 98 Pac. 160).

In *Coquille M. & M. Co.* v. *Johnson,* 52 Or. 547, 549 (98 Pac. 132, 132 Am. St. Rep. 716), it is held that as the land abutted upon the Coquille River, which is navigable at the point in question, by virtue of the act of October 21, 1876, of the legislative assembly of this state (Sess. Laws 1876, p. 69), Gilman's title was extended to low-water mark. At page 551 of 52 Or. (page 134 of 98 Pac., 132 Am. St. Rep. 716), the following is quoted with approval: "Riparian owners upon navigable fresh rivers and lakes may construct, in the shoal water in front of their land, wharves, piers, landings, and booms, in aid of and not obstructing navigation"—citing 2 Gould, Waters (2 ed.), § 179; *Montgomery* v. *Shaver,* 40 Or. 244 (66 Pac. 923); *Stevens Point Boom·Co.* v. *Reilly et al.,* 44 Wis. 295; *Boom Co.* v. *Patterson,* 98 U. S. 403 (25 L. Ed. 206). In regard to tide land, in *Grant* v. *Oregon Nav. Co.,* 49 Or. 324, at page 328 (90 Pac. 179), Mr. Justice EAKIN said: "By the legislative acts of 1872 (Laws 1872, pp. 129, 130) and 1874 (Laws 1874, pp. 76, 77) the upland owner was given the preference right to purchase the tide land, and upon such purchase, if not already vested in another under Section 4042, B. & C. Comp., he thereby acquired also the exclusive wharfage right to deep water, and also all accretions to his tide land and the right to fill up the shallows or flats, so long as he does not impede navigation or interfere with commerce over the same"—citing *Miller* v. *Mendenhall,* 43 Minn. 95 (44 N. W. 1141, 8 L. R. A. 89, 19 Am. St. Rep. 219). In *Montgomery* v. *Shaver,* 40 Or. 244, 248 (66 Pac. 923, 924), Mr. Justice WOLVERTON, referring to the wharf act, said: "The statute is, however, declarative of the right or privilege which existed at common law, the exercise of which might be

regulated by statute; but so long as it was not prohibited it existed as a private right derived from the passive or implied license by the public: Gould, Waters, § 176. So that the enactment of Section 4227 [B. & C. Comp.] gave positive authority where it previously existed passively and by implication.

In many states lands totally or partially submerged are made the subject of grant by the sovereign in order that they may be reclaimed for useful purposes: *Taylor Sands F. Co.* v. *State Land Board,* 56 Or. 157, 161 (108 Pac. 126); *Fowler* v. *Wood,* 73 Kan. 511, 549 (85 Pac. 763, 6 L. R. A. (N. S.) 162, 117 Am. St. Rep. 534). A grant by the sovereign of land bounded by a navigable river limits the land conveyed to high-water mark and gives the grantee no private or exclusive right below that. In such case the grant is exclusively a grant of dry land, and is to be construed without reference to the water just as if it were bounded on all sides by dry land. But when the sovereign state grants land under water, which cannot, in its natural state, be subjected to any of the uses to which dry land may be devoted, then a different rule of construction must be applied to the grant so as to make it effectual for some purpose. Such a grant may be made to enable the grantee to fill up the land for wharves, docks, or other buildings. If the purpose be not plainly expressed in the grant, then the intent of the parties must be ascertained from the nature and situation of the land granted and all the circumstances surrounding the grant which may properly be considered for the purpose of ascertaining such intent: *Langdon* v. *Mayor etc. of New York,* 93 N. Y. 129, 144.

14. In the light of the authorities, and upon principle, we conclude that the State of Oregon, upon its admission into the Union, became the owner of the bed and banks of the Willamette River up to the line

of ordinary high water, subject only to the paramount right of navigation and the right of Congress to regulate commerce between the state.

15. By the platting and dedication of Watson's and Doscher's Additions by the former owners, thereby laying out the property in blocks and lots constituting definite metes and bounds as shown on the maps, and by the conveyances of lots with reference to the maps, the wharf rights were severed and disassociated from all the inside lots and attached to the outermost ones: *Grant* v. *Oregon Nav. Co.,* 49 Or. 324, 330 (90 Pac. 178, 1099).

16. The act of 1862 (Section 5201, L. O. L.) grants the right of wharfage across the state's land out to the harbor line fixed by state authority to the riparian owner. This license has never been revoked by the state but has been reaffirmed by the lawmakers and upheld by the courts. The contemplated use of the land is not inimical to navigation. On the other hand, it is plain to anyone that the industries of commerce and manufacture with which the shore of the Willamette in our metropolis teems, and the storing of the articles and products, as well as the construction of docks and wharves, are an acceleration to navigation. The legislature, considering that the lands adjacent to the Willamette, Coquille, Coos and Umpqua Rivers were subject to erosion and inundation, deemed it wise and just to recognize rights in the riparian owners on such streams and grant and confirm to them all the title of the state to any tide and overflowed lands upon said rivers. This, no doubt, among other reasons, in order that the owners of land adjacent to such rivers might be encouraged and protected in building structures thereon and riprapping and conserving the banks of the rivers for the purpose of saving their lands from loss or destruction.

65 Or.—26

17. The acts of 1874 and 1876 were a valid exercise of the legislative will and granted and confirmed the title of the state to the tide and overflowed land upon said rivers to the upland owners. Plaintiff has succeeded to the title which the state formerly had in the lots described. Its title is subject to the paramount right of navigation existing in the public and subject to such reasonable regulation as the state through its municipality may prescribe.

18. To allow this property to be taken for public use without just compensation would work a great injustice and do violence to the Constitution of Oregon.

19. The restrictions upon the state conveying land subjacent to the waters of navigable rivers should, we think, generally speaking, apply to lands under navigable waters, or below ordinary low-water mark, or the bed proper of a river as distinguished from its bank or shore as in the Chicago Waterfront case.

These considerations lead to an affirmance of the decree of the lower court, and the decree is therefore affirmed.                                                  AFFIRMED.